Max KUNEY, Jr., and Constance K. Kuney, His Wife; Max J. Kuney, Sr., Olive R. Kuney, Appellants,

v.

William E. FRANK, District Director of Internal Revenue, Appellee.

Nos. 17507–17509.

United States Court of Appeals
Ninth Circuit.

Oct. 11, 1962.

Rehearing Denied Nov. 16, 1962.

Clodfelter & Bowden, and Allen A. Bowden, Seattle, Wash., for appellants.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, I. Henry Kutz, and Donald P. Horwitz, Attys., Dept. of Justice, Washington, D. C., Brockman Adams, U. S. Atty., Seattle, Wash., for appellee.

Before HAMLIN, MERRILL and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge.

In these three cases we are again in the never-never land of family partnerships and the income tax. Each case is an action to recover taxes claimed to have been illegally collected, following denial of claims for refund. The cases were consolidated for trial and are also consolidated on appeal. A jury returned a verdict in favor of the appellant taxpayers. Thereafter, pursuant to Rules 50(b) and 59, F.R.Civ.P., 28 U.S.C.A., a motion was made by appellee, District Director of Internal Revenue, for a judgment notwithstanding the verdict and, in the alternative, for a new trial. The court granted and entered judgment notwithstanding the verdict, and denied the motion for a new trial. All plaintiffs appeal.

The sole question is whether there was substantial evidence to sustain the verdict. The trial court held that there was not, and we agree.

The jury was instructed to return a special verdict, and did so, in the following form:

"On a consideration of all facts and circumstances shown by the evidence and under the law given you by the Court, do you find the status of Kuney Sr. and Kuney Jr. in their trustee capacity (separate and apart from their personal capacity) as partners in the Kuney family partnership genuine, bona fide and valid for income tax purposes?

"Answer yes or no.

"Yes."

In granting judgment n. o. v., the Court said:

"Conceding that in the record there is some evidence not inherently incredible which might support a fact finding favorable to plaintiffs on one or more of the factors referred to, [factors entering into the ultimate decision as to the bona fides of the arrangement] it appears clear to me that a finding favorable to plaintiffs on the vital element pertaining to retention and exercise of control, referred to in two or three of the factors, is positively negatived by the evidence, and there is no evidence whatever to support the finding favorable to plaintiffs as to those elements."

It is upon this ground that we are affirming.

■ We are often astonished at the apparent naiveté of taxpayers, and, sometimes, of their counsel. The courts have said, almost ad nauseam, and in various ways, that the income tax relates to realities, so that "By the simple expedient of drawing up papers, single tax earnings cannot be divided into two tax units and surtaxes cannot be thus avoided." (Commissioner v. Tower, 1946, 327 U.S. 280, 291, 66 S.Ct. 532, 538, 90 L.Ed. 670). This is but another way of stating the principle, announced in Helvering v. Horst, 1940, 311 U.S. 112, 119, 61 S.Ct. 144, 148, 85 L.Ed. 75, that "The dominant purpose of the revenue laws is the taxation of income to those who earn or otherwise create the right to receive it and enjoy the benefit of it when paid." The principle has been repeatedly applied and one of its corollaries is that actual retention of the control of income and assets that produce it results in taxation of that income to him who retains the control.

Yet taxpayers persist in creating paper concepts, "for tax purposes," and then going about their business as if the concepts did not exist. Sometimes, as in this case, both they and their counsel seem to have the notion that the tax laws govern their economic relationships and dealings, rather than merely attaching tax consequences to what they themselves actually do, so that economic realities are supposedly created, many years after the fact, by the government's auditors, and can be juggled retroactively by the taxpayers, to fit whatever tax concept saves them the most tax.

In the case of family partnerships, there are two factors that encourage such Alice in Wonderland performances on the part of taxpayers. One is the family relationship itself, which so readily lends itself to paper arrangements having little or no relationship to reality. (See Helvering v. Clifford, 1940, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788; Commissioner v. Tower, supra; Lusthaus v. Commissioner, 1946, 327 U.S. 293, 66 S.Ct. 539, 90 L.Ed. 679; Commissioner v. Culbertson, 1949, 337 U.S. 733, 69 S.Ct. 1210, 93 L. Ed. 1659).

■ The other is sections 191 and 3797(a)(2) of the Internal Revenue Code of 1939, as added and amended, respectively, in 1951 (Rev.Act 1951, § 340, 65 Stat. 452, 511), now embodied in section 704(e) of the Internal Revenue Code (26 U.S.C. § 704(e)). It has been said that these sections "legitimatized family partnerships" (Stanback v. Commissioner, 4 Cir. 1959, 271 F.2d 514, 518). It was in reliance upon these sections that the family partnership here involved was created. But we have held that the sections do not legitimatize all family partnerships. (Spiesman v. Commissioner,

9 Cir. 1958, 260 F.2d 940). They simply apply the rule that income arising from capital is attributable to the owner of that capital. (Blair v. Commissioner, 1937, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465). Thus section 191 (now § 704(e) (2)) provides: "In the case of any partnership created by gift, the distributive share of the donee under the partnership agreement shall be includible in his gross income, except to the extent that such share is determined without allowance of reasonable compensation for services rendered to the partnership by the donor, and except to the extent that the portion of such share attributable to donated capital is proportionately greater than the share of the donor attributable to the donor's capital." This is buttressed by section 3797(a) (2), (now § 704(e) (1)), which says "A person shall be recognized as a partner for income tax purposes if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person." These provisions recognize the principle that earnings are taxed to him who earns them, and the principle that income from capital, however acquired, is attributable to its owner. They eliminate, as a factor to be considered in determining the bona fides of a family partnership, the fact that the new partner acquired his interest by gift, and that he may be an inactive partner.

As we pointed out in Spiesman, supra, the report of the House Ways and Means Committee (H.Rep.No. 586, 82nd Cong., 1st Sess., p. 33, 1951–2 Cum.Bull. 357, 381) makes it clear that these sections do not legitimatize all family partnerships. After stating the foregoing principles, the report states:

> "The amendment leaves the Commissioner and the courts free to inquire in any case whether the donee or purchaser actually owns the interest in the partnership which the transferor purports to have given or sold him. Cases will arise where the gift or sale is a mere sham. Other cases will arise where the transferor retains so many of the incidents of ownership that he will continue to be recognized as a substantial owner of the interest which he purports to have given away, as was held by the Supreme Court in an analogous trust situation involved in the case of Helvering v. Clifford, (309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788). The same standards apply in determining the bona fides of alleged family partnerships as in determining the bona fides of other transactions between family members. Transactions between persons in a close family group, whether or not involving partnership interests, afford much opportunity for deception and should be subject to close scrutiny. All the facts and circumstances at the time of the purported gift and during the periods preceding and following it may be taken into consideration in determining the bona fides or lack of bona fides of a purported gift or sale."

See, also, Reg. 118 (1939 Code), § 39.-191-1(b), 26 C.F.R. (1953) § 39.191-1 (b) and (1954 Code), 26 C.F.R. § 1.704.-1(c).

Here, although it is conceded that the gifts of partnership interests were valid under state law, and that capital was a material income-producing factor, the trial judge concluded that the arrangement was, as a matter of law, invalid for tax purposes, because the evidence shows, without contradiction, that the appellants retained control of the income and of the donated interests.

The evidence, all of it coming from the mouths of appellants and their Certified Public Accountant, discloses the following uncontradicted facts: The tax years involved are 1952, 1953, and 1954. Prior to 1952, Max J. Kuney and his son, Max J. Kuney, Jr., were engaged in the heavy construction business, as partners, in Spokane and Seattle. They operated under a written agreement of partnership. After the passage of section 191 and the amendment of section 3797(a)

(2) of the Internal Revenue Code of 1939, and on February 11, 1952, Kuney Senior executed a Trust Agreement, in which Kuney Junior is made trustee for the benefit of the minor son of Kuney Senior, then seven years old, and Kuney Junior and wife executed a similar Trust Agreement in which Kuney Senior is made trustee for the benefit of the two minor children, then six and two years old, and the mother and grandparents, of Kuney Junior. Each agreement assigns to the trustee a $100,000 interest out of the grantor's interest in the partnership. Each gives to the trustee unlimited discretion as to the management of the trust and the payment to or withholding of income from the beneficiaries, during minority, in the case of minors, including power to pay it to the parent of a minor, "without any responsibility for the application thereof by such * * * parent." Thus each trustee could pay the entire income to his grantor. Each agreement contains the broadest possible exculpatory clauses.

No amendment to the articles of partnership was executed; the transfer was effected by setting up a capital account on the partnership books captioned "Max J. Kuney [or Jr.] Trustee." At the same time, by two separate writings, each grantor agreed with the trustee of his trust that "effective January 1, 1952, total Max J. Kuney [or Jr.] income shall be distributed annually between Max J. Kuney [or Jr.] and trust * * * as provided by the rules of law then effective for family partnerships and in conformity with the provisions of said trust." The Kuneys meant by this, section 191 of the Internal Revenue Code.

In May of 1953, Kuney Senior decided to form a corporation and transfer to it all of the partnership assets except machinery, equipment, land and buildings. He did this because it would be a convenient way to give two of his associates an opportunity, by buying stock in the corporation, to acquire an interest in the business. He had in mind a 20% interest for one of them, and that person could not afford to invest so great an

amount as 20% of the value of the entire partnership. All of the corporate stock was issued to and owned by the partnership, thus giving to each trust an undivided interest in the stock, as part of the partnership assets. In February, 1957, at a meeting of the corporation, Kuney Senior stated that the stock had been incorrectly issued, and should have been issued one-half to Kuney Senior and one-half to Kuney Junior. This was then done, retroactively, by the board of directors. If the partnership was consulted, the record does not show it. Kuney Senior testified that the beneficiaries of the trusts were thus deprived of their interests in the corporation. His testimony also shows:

"Q. (By Mr. Biggins): And all they had left was the interest in the fixed assets which were leased to the corporation, leased or rented, that is all? A. That is what they had.

"Q. And you have never in your long business life ever treated a business partner that way now, have you? A. (No response.)"

\* \* \* \* \* \*

"The Court: The record will show no response to the last question."

It happened that in subsequent years the business operation, being conducted by the corporation, did not do so well as formerly, but that was not expected when the corporation was formed.

The corporation never paid a dividend, so that the income of the partnership was derived solely from the rent received from the corporation and from capital gains upon the sale of fixed assets. The record is clear that the Kuneys, Senior and Junior, fixed the rent, and fixed it at the lowest amount that they could get a treasury agent to accept. The reason is clear: As partners, they would pay personal income tax on their shares of the rent received. At first, rent was fixed by Kuney, Jr. at one-half "the A. E. D. [American Equipment Dealers] rates, as they are called, the going rate in the industry." This rate was applied to the book value, so that no rent at all was

paid on fully depreciated items, even though, as sales showed, they had substantial value. Thus the corporation used most of the equipment rent free. This arrangement was questioned by an Internal Revenue agent, and it was then decided to pay no rent at all until it was learned what the agent would approve. When agreement was reached with the agent in 1957, the books were then adjusted, retroactively over the years, to show the agreed amount as the rent paid. Thus, the income of the partnership, and hence, of the trust as partners, was entirely controlled by the Kuneys, in the manner most beneficial to them individually from a tax standpoint. Indeed, in one later year, no rent at all was paid.

Moreover, the Kuneys retained and exercised control over the size of the share of the trusts in the partnership assets. The corporation episode, with its unilateral and retroactive change in stock ownership, is one example. In addition, as rents came in, they were, for the most part, retained in the partnership and not paid out to the partners. Kuney Senior described these funds as a "surplus." Each of the two Kuneys had a capital surplus account, and they controlled what went into it and changed it at will. Thus the trusts could be, and were, deprived of an interest in partnership assets, at the will of the Kuneys. Nor was this all. The Kuneys and their Certified Public Accountant testified that they construed the reference in their agreements to the law governing family partnerships to require that income be distributed in proportion to the capital accounts of the partners. Both the creation of, and changes in, the surplus account necessarily changed the interests of the partners in the partnership, and so changed the share of income of each partner, including each trust. In the words of the Certified Public Accountant, the surplus account "is used primarily for—as a basis for determining the profits, division of profits among the partners." Perhaps it is unnecessary to add, but the Certified Public Accountant's testimony is also clear, first, that the existence of such a surplus account is unorthodox and not in accord with customary practice, and second, that in any event the actual allocation of income among the partners did not, in fact, follow the formula that the Kuneys said was controlling. He testified that in some years the Kuneys computed interest (i. e., partnership interest) on total investment and in other years they computed it on breakdown, including fixed assets; they went back and forth. When he distributed income as directed by Kuney Senior, he did not distribute income in proportion to each partner's capital investment in the partnership.

As if the foregoing were not enough, it also appears that the Kuneys directed that their compensation for services should be paid out of capital gains, and that the partnership assets were used for the credit of the corporation in its borrowings.

We think it apparent that the two Kuneys, as individuals rather than trustees, did, in fact, have complete control of the income and assets of the trusts—of whether they would receive any income, and if so, how much, and of the nature and value of the assets. Against these uncontradicted facts, there is only their own ipse dixit as to their bona fides and their acting, as trustees, in a manner independent of themselves in their individual capacities. Such self-serving conclusions, in the face of what actually happened, are not sufficient evidence to sustain a verdict. (Cf. Sellers v. Commissioner, 9 Cir. 1955, 218 F.2d 380.)

■■ We are fully aware that ordinarily the question as to whether a family partnership is real, is one of fact, not of law. (See Commissioner v. Culbertson, 1949, 337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659). It follows that the verdict of a jury will usually provide the final answer to that question. But, as is true of any other question of fact, where the only evidence points solely to one conclusion, that conclusion must follow as a matter of law, and a judgment notwithstanding a verdict to the contrary is proper. Here, such evidence compels

the conclusion that what was attempted was "to shift tax incidence by surface changes of ownership without disturbing in the least his [taxpayer's] dominion and control over the subject of the gift or the purposes for which the income from the property is used. He is able, in other words, to retain 'the substance of full enjoyment of all the rights which previously he had in the property'." (Commissioner v. Culbertson, supra, at p. 746, 69 S.Ct. at p. 1216.)

We hold that, where such control of income and of the donated interest as here exists is retained by the donors of interests in a family partnership, the income is, as a matter of law, to be treated as, and taxed as, income of the donors.

Affirmed.