**UNITED STATES of America, Appellant and Cross-Appellee,**

v.

**Joe R. RAMOS and Mary Ramos, Appellees and Cross-Appellants.**

**Nos. 21824, 21824 A.**

United States Court of Appeals Ninth Circuit.
April 10, 1968.
Rehearing Denied in No. 21824 June 25, 1968.

Stephen H. Paley (argued), Lee A. Jackson, Loring W. Post, Attys., Dept. of Justice, Mitchell Rogovin, Asst. Atty. Gen., Washington, D. C., Cecil Poole, U. S. Atty., Richard L. Carico, Asst. U. S. Atty., San Francisco, Cal., for appellant.

Jasper C. De Dobbeleer (argued), Jerome A. Duffy, San Rafael, Cal., for appellee.

Before CHAMBERS, JERTBERG and ELY, Circuit Judges.

JERTBERG, Circuit Judge:

Before us are two family partnership cases. Both involve federal income tax claims,—one for the year 1956, and the other for the year 1957. The two cases were consolidated for trial in the district court, and are before this court on a consolidated record.

In the first case, the Commissioner of Internal Revenue determined that the entire income from a partnership allegedly entered into and existing during the year 1956, by and between Joe R. Ramos and Mary Ramos, his wife, appellees, (Joe R. Ramos being hereinafter sometimes called "taxpayer"), and their son and daughter, Joe S. Ramos and Dolores Donaldson, respectively, must be taxed to the appellees. In the second case the Commissioner of Internal Revenue determined that the entire income from a partnership allegedly entered into and existing during the year 1957, by and between Joe R. Ramos and his son and daughter, must be taxed to the appellees.

The deficiencies assessed in each case were paid, and claim for refunds were filed and rejected. Within the time provided in § 6532 of the Internal Revenue Code of 1954, appellees instituted actions in the district court for the recovery of taxes paid for the years 1956 and 1957.

The cases were tried to the court sitting without a jury. Following trial the district court held that a valid family partnership existed during 1956, composed of appellees and their two children, and that a valid family partnership existed during 1957 composed of taxpayer, Joe R. Ramos, and the two children. The district court also determined the "corrected" partnership income and the distributive shares of the partners on the basis of various adjustments, including the allowance of twenty-five percent of the crop receipts as rent owing to appellees by the partnership for the two taxable years, and the allocations in equal amounts among members of the 1956 partnership of the sum of $157,088 received in 1957 from crops sold in 1956.

The Government appeals from the judgment entered by the district court, and the appellees cross-appeal from certain portions of said judgment.

The district court and the parties to this appeal are in agreement that the basic facts disclosed by the record are virtually undisputed. Our review of the record and examination of the briefs cause us to adopt, as the basic and relevant facts, the statement of facts which appear in the brief filed by the Government, as appellant. We find nothing in

the briefs filed by the appellees which takes serious issue with such statement.

The statement, with slight editing on our part, is as follows:

Taxpayers, Joe R. and Mary Ramos, are husband and wife and reside on a 219-acre ranch near Winters, California. They purchased this ranch in the latter part of 1943 and have lived on and farmed it continuously from that time. Approximately 175 acres of the ranch are planted in mature almond trees with the balance being planted in peaches and olives. The land, trees and other improvements which comprised the taxpayers' ranch and the equipment necessary for its operation had a value of $200,000 to $230,000 during 1956 and 1957, the years in suit.

Taxpayers' daughter, Dolores Donaldson, was 24 years old in 1956 and by that year had graduated from Sacramento Junior College and was married. From the time she was in high school, Dolores had done the bookkeeping for the ranch as well as for her parents' other business ventures. She was paid for these services and in 1955 received $75 for this work.

Taxpayers' son, Joe S. Ramos, had worked on taxpayers' ranch on weekends and during vacations from school. From the time he graduated from high school, he was paid for his work. After he graduated from Sacramento Junior College in June of 1955, he worked on the ranch and was paid accordingly. On November 22, 1955, Joe S. Ramos went on active duty with the United States Navy and was shortly thereafter transferred to Hawaii. At the beginning of the period in suit, Joe S. Ramos was 21 years old.

Taxpayer's brother, Frank D. Ramos, was foreman of the ranch prior to the years in suit and throughout the period Joe S. Ramos was in the Navy.

As of January 1, 1956, a "family partnership" composed of the taxpayers and their children, Dolores Donaldson and Joe S. Ramos, purportedly was to commence. This partnership was to operate taxpayers' ranch for the year 1956, with each of the four partners having a 25

percent interest in the business. The partnership acquired no interest in the land, trees and other improvements which made up the taxpayers' ranch or in the equipment necessary for its operation, as these assets were retained by taxpayers. The partnership did not pay any rent in 1956 for these assets. Neither Dolores Donaldson nor Joe S. Ramos contributed any capital to the partnership for 1956.

During 1956, the ranch continued to operate under the name of "Joe R. Ramos." The expenses for operating the ranch for that year were paid from taxpayers' joint checking account with the Bank of America at Winters, with the receipts from the operation of the ranch being deposited to that account. This account included funds other than partnership funds. The accounting records for the 1956 ranch operations were kept on the cash basis and were merely a continuation of the individual records maintained for taxpayers in previous years.

The 1956 federal employer's withholding tax return for the ranch employees was filed in the name of "Joe R. Ramos, owner" and under the account number assigned to him. On January 28, 1958, Dolores Donaldson advised the District Director that the employer's return for 1956 should have been filed under the name and account number for "Joe R. Ramos & Co." However, that account number was not applied for until November of 1957 and was obtained for a partnership that did not include Mary Ramos as a partner. The workmen's compensation report for that year was also filed under taxpayer's name.

Because of his experience, taxpayer was senior partner and "boss" of the partnership. He made the decisions concerning the sale of crops grown on the ranch and generally supervised the ranch operations. However, he received no salary or allowance for his work.

Taxpayers' daughter, Dolores, lived in Winters with her husband and worked full time throughout 1956 as a clerk for Pacific Gas & Electric Company. As compensation for doing the bookkeeping for the partnership on a part-time basis,

she received $150. She was also paid $35 for two days' field work.

Taxpayers' son, Joe, was on military duty in Hawaii during 1956 with the exception of the last week in December. During that brief stay at home, he did not do any work on the ranch.

The 1956 almond crop was sold on June 26, 1967, by Joe R. Ramos as the seller.

For 1956, the partnership filed a federal partnership information return in the name of "Joe R. Ramos Co." This return was filed on the cash basis and reflected total receipts of $220,640.68, of which $70,640.48 represented proceeds from the almond crop grown on taxpayers' ranch and sold in 1955. The return further reflected expenses of $68,477.04, including depreciation and real property taxes on assets belonging to taxpayer. The net income of $152,163.44, as shown on the return, was divided into four equal shares of $38,040.86, which shares were reported by the purported partners on their individual returns for 1956.

Dolores Donaldson's distributive share of the partnership's profit for 1956 was paid to her on February 14, 1957. She then paid $16,028.68 to the Internal Revenue Service in payment of her federal income taxes for 1956. In addition, she paid $1,160.34 to the Franchise Tax Board of the State of California in payment of her 1956 state income tax.

Payment of the distributive share of Joe S. Ramos, who was then in Hawaii, was handled as follows: $17,472.56 was paid to the Internal Revenue Service from taxpayers' joint checking account for their son's 1956 federal income taxes and $19,173.85 was deposited to a savings account maintained in the names of "Ramos, Joe S. or Joe R." in the form of a check drawn on taxpayers' joint account. Taxpayer then withdrew $2,217.-75 from the account he had with his son to pay state and additional federal income taxes for Joe S. Ramos for 1956.

For 1957, a different partnership was purportedly organized to operate taxpayers' ranch. A written agreement was entered into by taxpayer and his son and daughter which provided that they would engage in the farming business under the name of "Joe R. Ramos & Co." until January 1, 1962, and that each would receive 33⅓ percent of the profits. Mary Ramos was not a party to this agreement and was not to be a partner in 1957. The partnership agreement in pertinent part, further provided:

3. *Capital.* The capital of the partnership shall be contributed by the partners, in cash, as follows:

| Joe R. Ramos | $15,000.00 |
| Dolores Donaldson | $15,000.00 |
| Joe S. Ramos | $15,000.00 |

The foregoing capital consists entirely of cash and represents the entire assets of the partnership at the commencement of the calendar year 1957.

\* \* \* \* \* \*

5. *Salaries of Working Partners.* Joe R. Ramos shall devote full time and attention to the partnership business, and upon his release from military service, Joe S. Ramos will devote such time and attention to the partnership business as he is able. Dolores Donaldson shall render bookkeeping services for the benefit of the partnership. And each of the partners shall receive such monthly salaries as may from time to time be fixed by mutual agreement between them, such salaries to be an allowance of reasonable compensation for services actually rendered to the partnership. Notwithstanding the foregoing, the amount of such salaries shall be subject to the provisions of paragraph —— hereof.

\* \* \* \* \* \*

7. *Drawing Accounts.* \* \* \* Except as otherwise specifically provided herein, no part of the capital contribution of the partners shall be withdrawn without the unanimous consent of the partners.

8. *Management.* The partnership business shall be managed by the working partners, but in the event of any disagreement between them, the decision of Joe R. Ramos shall be controlling.

9. *Restrictions on Partners.* * * * No partner shall, except with the consent of the other partners, assign, mortgage or sell his share in the partnership or in its capital assets or property, or enter into any agreement as a result of which any person shall become interested with him in the partnership, * * *. * * *

10. *Banking.* All funds of the partnership shall be deposited in its name in such checking account or accounts as shall be designated by the working partner or partners. All withdrawals therefrom are to be made upon checks signed by Joe R. Ramos.

As in 1956, the land, trees and improvements which made up taxpayers' ranch and the equipment necessary for its operations were not transferred to the partnership. However, about the same time the 1957 partnership agreement was signed, a Memorandum of Rental Agreement was entered into by all partners on behalf of "Joe R. Ramos & Co." and by the taxpayers individually. This agreement provided:

Joe R. Ramos & Company, a partnership will rent from Joe R. Ramos and Mary S. Ramos, for a two-year period commencing November 1, 1956 and terminating November 1, 1958, approximately 175 acres located near Winters and belonging to the owners. The rent to be paid to owners shall be 25% of the gross sale price of the crops raised thereon during the term and the partnership shall pay all expenses except real property taxes and machinery costs, said machinery to be supplied by owner, except that minor repairs to machinery for maintenance and less than $100.00 shall be paid by the partnership.

Until the end of March, 1957, banking for the partnership was handled through taxpayers' joint account with the Bank of America at Winters. At that time, taxpayer and his son and daughter each contributed $15,000 to the partnership. The contributions of Dolores and Joe S. in 1957 were derived from the profits of the 1956 partnership. The actual mechanics of making these contributions involved the issuance of checks to the children from taxpayers' account with the Bank of America at Winters, the depositing of these checks to accounts maintained by the children, and the purchasing of cashier's checks for the funds actually deposited to the account opened in the name of "Joe R. Ramos & Co." with the First National Bank of Dixon. These contributions were deposited to the account of "Joe R. Ramos & Co.", which was opened at the First National Bank of Dixon. This account and a savings account subsequently opened in the same name could be drawn upon only by Joe R. Ramos or Mary Ramos.

The partnership books for 1957 were kept on the cash basis and in substantially the same form as the books kept for taxpayers in previous years. A similar set of books was also kept for taxpayers in 1957.

For 1957, business was done mainly in the name of "Joe R. Ramos & Co." A fictitious name certificate listing the purported partners was executed in July of that year and filed with the County Clerk of Solano County in Fairfield, California, but was not published until September in a local newspaper. The 1957 almond crop was sold under a contract made by "Joe R. Ramos & Co." as seller and payments were made in that name by the purchaser. The federal employer's withholding tax return was filed under the account number obtained for the 1957 partners and the workmen's compensation report for 1957 was also filed in the partnership name.

Dolores Donaldson, in acting as bookkeeper for the 1957 partnership, did essentially the same work which she had done in prior years for taxpayers. Taxpayers' son was not separated from the Navy until October of 1957 and worked on the ranch for only the last three months of the year. He received a salary of $350 per month during this period.

For 1957, a federal partnership information return was filed on the cash basis in the name of "Joe R. Ramos & Co." This return reflected total receipts

in the amount of $194,206.45, including $157,088.71 from almonds and other crops which were raised, sold and delivered in 1956. Rent to Joe R. Ramos in the amount of $48,480.08, and other expenses of $43,044.58 were deducted from the total receipts to arrive at a net income of $102,681.79 for the year. The sum of $48,480.08 was paid by partnership receipts of $30,000 and $7,239.41 which taxpayer withheld as advance rent, and a check for $11,240.67 which was drawn by the partnership in 1958. The sum of $48,480.08 was approximately 25 percent of the gross crop receipts received in 1957 and was determined without regard to the period in which the crops were grown, whereas the rental agreement purportedly in effect for 1957 provided for only 25 percent of the gross receipts for crops grown on the premises after November 1, 1956.

Dolores Donaldson and Joe S. Ramos each reported $34,227.25, or one-third of the partnership net income, on their individual federal income tax returns for 1957. Taxpayers reported the remaining one-third of the net income and rent in the amount of $48,480.08 on their 1957 federal income tax return.

On February 6, 1958, Dolores Donaldson and Joe S. Ramos each received $15,-000 as a partial distribution of the profit reported by the partnership for 1957. No other payments were made to either of them for the remainder of their 1957 distributive shares.

On February 10, 1958, Dolores Donaldson and her husband paid a total of $14,-622.98 for 1957 federal and state income taxes due in addition to the taxes withheld from their salaries. On the same day, Joe S. Ramos and his wife paid 1957 federal and state income taxes totaling $12,343.30.

We first consider the validity of the oral "family partnership" claimed to be in existence for the year 1956. Preliminarily, we recognize that for several years prior to 1956, the members of the Ramos family had discussed, and intended to enter into, a family ranching partnership when the son became twenty-one years of age. We do not doubt that they intended to enter into a family ranching partnership for the year 1956. More than intention, however, is required to effectuate such purpose.

It is evident that neither the son nor daughter contributed any capital to the claimed partnership. The son contributed no significant services during the year 1956. He went on active duty with the Navy in the fall of 1955, and shortly thereafter was transferred to Hawaii where he remained throughout 1956, with the exception of the last week in December when he was home on a short leave, at which time he did not work on the ranch. The daughter, who throughout the year was a full-time employee of Pacific Gas and Electric Company, did the bookkeeping for the claimed partnership, and was paid $150.00 for such services. She rendered the same service to her parents for the year 1955 and received payment for such services in the sum of $75.00. No rent was paid by the partnership to the parents for the land and equipment. The father supervised the farming operations for which no compensation was paid to him by the partnership for such services.

Hence, we have before us a claimed family partnership in which the parents retained ownership and control of the income producing properties, and to which the children contributed neither property nor services except the bookkeeping services of the daughter, for which services she was compensated.

In order to sustain their position, the taxpayers seek the benefits provided by §§ 191 and 3797(a) (2) of the Internal Revenue Code of 1939, as added and amended, respectively, in 1951 (Rev.Act 1951 § 340, 65 Stat. 452, 511), now embodied in Section 704(e) of the Internal Revenue Code (26 U.S.C. § 704(e)).

Section 704(e) provides:

"(e) *Family partnerships.—*

(1) *Recognition of interest created by purchase or gift.—*A person shall be recognized as a partner for purposes of this subtitle if he owns a capital

interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person.

(2) *Distributive share of donee includible in gross income.*—In the case of any partnership interest created by gift, the distributive share of the donee under the partnership agreement shall be includible in his gross income, except to the extent that such share is determined without allowance of reasonable compensation for services rendered to the partnership by the donor, and except to the extent that the portion of such share attributable to donated capital is proportionately greater than the share of the donor attributable to the donor's capital. The distributive share of a partner in the earnings of the partnership shall not be diminished because of absence due to military service.

(3) * * *."

These sections were dealt with by this court in Kuney v. Frank, 308 F.2d 719 (9th Cir. 1962), at p. 721, where it is stated:

"These provisions recognize the principle that earnings are taxed to him who earns them, and the principle that income from capital, however acquired, is attributable to its owner. They eliminate, as a factor to be considered in determining the bona fides of a family partnership, the fact that the new partner acquired his interest by gift, and that he may be an inactive partner."

In support of their position taxpayers state in their brief:

"The Government's statement that neither the daughter nor the son contributed any capital to the partnership in 1956 is again unwarranted. The daughter and son having each acquired a 25% interest in and to the 'crops business' contributed that 25% interest to the partnership; the 'crops business' consisting of the right of use and control of the trees, lands and equipment, together with all accounts receivable of the said business and each of the children then contributed their said 25% interest in and to the right of use, control, possession and enjoyment of the said lands, trees and equipment and the 25% interest each in and to the accounts receivable of the business during the 1956 partnership. We respectfully submit that the documents representing ownership of the lands, trees, equipment and accounts receivable could of themselves produce nothing. It is the use and control of the lands, trees and equipment and the accounts receivable of the business which produce either profit or loss. These are rights of substantial economic value. The accounts receivable of the business at the time of the creation of the partnership on September 17, 1955 were in the sum of $70,640.48. It is thus apparent that each child in contributing his interest in the account receivable in effect made a capital contribution to the partnership of $17,-460.12 each, and that this $17,460.12 contributed by the son and the daughter was commingled with and was actually used in the operation of the ranch. Their contributions, therefore, were of a definite economic value to the partnership."

The record furnishes no support for such contentions. In this respect we again quote from the taxpayers' brief:

"Perhaps the most expressive statement of the existence and operation of the 1956 partnership is to be found in the testimony of Mrs. Dolores Donaldson as elicited on cross-examination:

'Q. That is essentially all he gave you on the ranch in '56, wasn't it, just an interest in the profits?

A. No.

Q. What was your interest? You didn't own land, did you Mrs. Donaldson, or any interest in the land?

A. No, we don't own the land.

Q. You don't own any interest in the machinery?

A. No.

Q. There was no cash capital put into the partnership in '56?

A. No.

Q. Well, what was your twenty-five per cent interest in 1956?

A. In the partnership agreement. When we formed it we were going to be partners, were going to be a family partnership, all together, and whatever income we made we would share.

If we had losses, we would share them and we would pay our expenses, and whatever was left we could share twenty-five per cent, my father, my mother, my brother and I. I don't think you have to own land to have a share in anything.

Q. In other words, you feel you can participate in the profits from the land without owning any portion of the land?

A. Yes.

Q. And this is the type of partnership interest that you had, just in the profits generated by the assets?*

A. Profits or losses that would be produced by the almond trees on the land.'" (Emphasis omitted.)

Thus, the daughter's statement reveals that the children received no interest whatever in the assets of the farming operation. Therefore, they were thus unable to contribute to the partnership that which they, themselves, did not have. The parents retained complete interest in the operating assets of the ranch.

Now we consider the validity of the written "family partnership" agreement claimed to be in existence for the year 1957. The 1957 agreement was in writing, instead of oral as in 1956. The pertinent provisions of this agreement are set forth earlier in this opinion.

Under this agreement each partner was required to contribute $15,000.00, and the aggregate amount of such contributions was to represent the entire assets of the partnership at its commencement. Taxpayer, Joe R. Ramos, was required to devote full time and attention to the business. His son, Joe S. Ramos, was still in the military service and upon his release therefrom was to devote such time and attention to the partnership business as he is able. Taxpayer's daughter, Dolores Donaldson, was to render bookkeeping services to the partnership. In the event of any dispute or disagreement between the partners, the decision of taxpayer was to be controlling, and all disbursements from the partnership bank account were to be withdrawn only upon checks signed by the taxpayer.

A two-year rental agreement was entered into, under which the partnership would lease from the taxpayers the ranching property and farming equipment belonging to the taxpayers,—the rental for the two-year term to be in the amount of twenty-five per cent (25%) of the gross sales price of the crops raised. The partnership would pay all expenses except real property taxes and machinery costs, except for minor maintenance repairs to machinery.

The cash contribution of the children, to the capital of the partnership, was made at the end of March 1957, and such contributions were derived by them from the profits of the 1956 partnership income. Funds of the partnership were in the name of the partnership in a commercial and a savings account. Checks on such accounts could be drawn only by either the father or mother.

Taxpayers' son was not separated from the Navy until October of 1957, and rendered no significant service to the partnership except for the last three months of the year, for which he was compensated at the rate of $350.00 per month.

As in 1956, the taxpayers retained ownership and control of the income producing properties during 1957. The father again supervised the farming operations for which no compensation was paid to him by the partnership for such services.

The economic relationships of the parties remained the same as in the claimed family partnership for 1956, unless it can be said that the contribution of each child of $15,000 to the capital of the partnership, in March 1957, was significant. The capital contributions of the children were derived from the profits of the 1956 partnership and were originally paid out of taxpayers' joint account and finally deposited in another bank account which taxpayers alone could draw upon. The procedure followed with respect to such withdrawal and deposit appears earlier in this opinion. The checking account which was opened with the capital contributions by the children and a $15,000 contribution by the taxpayer never fell below $40,000, and approximately $70,000 in partnership receipts were placed in a savings account and left untouched for the remainder of the year. Less than a month before, the taxpayer withdrew $30,000.00 as "advance rent." It is clear that the capital contributions of the children were not needed or utilized that year. In these circumstances we see no other purpose for the capital contributions of the children except to create the appearance of a change in the economic relationships of the parties.

The district court found that a valid partnership existed between the father, the mother and two children for the year 1956, and that a valid partnership existed between the father and the two children for the year 1957.

■ The government contends that each of said findings is "clearly erroneous."

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, at 395, 68 S.Ct. 525, at 542, 92 L.Ed. 746 (1947).

■ We are mindful that ordinarily the question as to whether a family partnership is valid is one of fact, not of law. Commissioner v. Culbertson, 337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659 (1949). However, as is true of any other question of fact, where all the relevant and material evidence directs us to but one conclusion, such conclusion must follow as a matter of law. See Kuney v. Frank, supra. Here the evidence compels the conclusion that the family arrangements, in each year, created only an anticipatory assignment to the children of future income from property owned and controlled by the parents, and the services of taxpayer.

As stated in Commissioner v. Culbertson, supra, at pp. 739–740, 69 S.Ct. at p. 1213:

"To hold that 'Individuals carrying on business in partnership' includes persons who contribute nothing during the tax period would violate the first principle of income taxation: that income must be taxed to him who earns it. Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930); Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788 (1940); National Carbide Corp. v. Commissioner, 336 U.S. 422, 69 S.Ct. 726, [93 L.Ed. 779] (1949)."

In our view the findings of the district court above stated are "clearly erroneous." Our review of the entire record in this case leaves us with the definite and firm conviction that the district court was mistaken in each of said findings.

Our holding that each of the partnerships is invalid makes it unnecessary for us to review those portions of the judgment entered by the district court relating to the determination of the "corrected" partnership income and the distributive shares of the partners on the basis of various adjustments appearing in the judgment, and renders moot the cross-appeal of appellees as to certain portions of such judgment, and requires a dismissal of the cross-appeal for mootness.

The judgment of the district court is reversed and the cross-appeal is dismissed as moot.