**HELVERING, Com'r of Internal Revenue,**
**v. TYLER.**

No. 11608.

Circuit Court of Appeals, Eighth Circuit.

April 29, 1940.

Rehearing Denied May 24, 1940.

F. E. Youngman, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and Berryman Green, Sp. Assts. to Atty. Gen., on the brief), for petitioner.

Harry B. Betty, of Davenport, Iowa (Betty & Betty, of Davenport, Iowa, on the brief), for respondent.

Before GARDNER, WOODROUGH, and THOMAS, Circuit Judges.

WOODROUGH, Circuit Judge.

This appeal is taken from a decision of the Board of Tax Appeals, entered May 26, 1939, and has been brought to this court by the Commissioner's petition for review. The Board entered a memorandum opinion, and as its findings are not reported they must be set forth as follows:

"Mellott: This proceeding involves a deficiency in estate tax in the amount of $11,-405.38. The sole question is whether $40,-000 paid to decedent's widow by the Prudential Insurance Co. under a policy taken out by the decedent three months before the date of his death should, or should not, under the facts, be included in decedent's gross estate.

"Findings of Fact.

"The decedent died testate March 31, 1936, at Davenport, Iowa. He was survived by his widow, two children born the issue of their marriage and a third born the issue of a prior marriage. The widow was duly appointed and qualified as the executrix of his estate. Within due time she filed an estate tax return and paid the tax shown to be due. Additional tax was subsequently assessed and paid and is not now in controversy.

"The age of the decedent at the time of his death was 71 years, 1 month and 20 days. Prior to his death he was vice-president of the Dewey Portland Cement Co., manager of its plant at Davenport, Iowa, and the owner of a substantial block of its stock. He received a salary of $16,000 per annum and the stock had paid some dividends. The condition of his health had generally been quite good and he had led an active life, supervising the cement plant.

"In January of 1935 the decedent was a patient at Mayo Brothers' clinic in Rochester, Minnesota, and was operated on for stomach trouble. The doctors diagnosed his ailment as carcinoma of the pyloris, and, although his wife knew the nature of his trouble, he apparently did not, the doctors having advised him that it was a growth upon, and an obstruction to, the duodenum.

"After his return from Mayo's in the spring of 1935 the decedent returned to his home in Davenport and again took up his duties at the cement plant. He seemed to be in good health that summer, though he returned to Mayo's for an examination. He expressed himself as feeling that the operation had been a success, showed some improvement in his health, went off the restricted diet, returned to his normal weight, and even indulged in sports such as playing ball with the cement plant employees. He did not discuss with his wife the possibility that he might die within a short time and expected to live to be a much older man.

"During the month of December, 1935, the decedent transferred to his wife a block of stock having a substantial value. On the same date he transferred to her two additional blocks of stock having a substantial value, as trustee for their two children.

"On December 31, 1935, the decedent signed two applications on forms supplied by the Prudential Insurance Co. of America. One was an application for a single

premium life insurance policy in the amount of $40,000 and the other was an application for a life annuity, purchase price $9,873.20, payable $1,178.17 annually. At the time these applications were signed the only insurance in force upon his life was a policy in the Aetna Insurance Co. in the amount of $2,000.

"The applications above referred to were transmitted to the Prudential Life Insurance Co. and, under date of January 8, 1936, two policies, or contracts, were issued —one, life insurance policy No. 9143960 in the amount of $40,000, and the other an annuity contract, No. A–12356, the purchase price of which was $9,873.20, which, by its terms, provided for annual payments to him of $1,178.17.

"The insurance policy was on the regular standard form generally used by the insurance company in connection with its life insurance contracts and, among other things, provided:

"The Prudential Life Insurance Co. of America (hereinafter designated as the company) in consideration of the application for this policy, which is hereby made a part of this contract, and copy of which application is attached hereto, and of the payment, in the manner specified, of the premium herein stated, hereby insures the life of the person herein designated as the insured for the amount named herein payable as specified, subject to the provisions printed or written by the company on the following pages which are hereby made a part of this contract.

"In the policy Herbert F. Tyler was designated as the insured, and the policy stated that the amount ($40,000) was payable immediately upon receipt of due proof of the death of the insured during the continuance of the policy to Okley G. Tyler, the wife of the insured. The right to change the beneficiary was reserved and it was provided that if no beneficiary be living at the date of the death of the insured the proceeds should be payable to his executors, administrators or assigns. The receipt of the single premium of $34,126.-80/100, payable in one sum on the delivery of the policy, was acknowledged. The policy contained the usual provisions with reference to change of beneficiary, change in mode of settlement or amount of insurance, options for settlement, incontestability after two years, provisions with reference to dividends, loan provisions, and cash surrender value. The table of cash surrender and loan values showed a cash surrender value of $730 per thousand at the end of the first year, the amounts increasing until the cash surrender value at the end of the 19th year was $912.

"No physical examination of the insured was required by the insurance company in connection with the execution or issuance of the single premium policy above referred to. It, however, would not have been issued unless the annuity contract had been purchased simultaneously.

"The Prudential Life Insurance Co. of America did not make a practice of issuing policies of life insurance to persons over sixty-six years of age. The policy was issued to Tyler because of the 'exceptional circumstance' that the annuity contract was purchased simultaneously. The company fixed the amount of premium to be charged upon the policy by considering the life expectancy of the insured, his age, the mortality tables, legal reserves, loading charges, probable earnings from interest, anticipated future expenses, and kindred factors, the sum of all producing the premium charge. The fact that an annuity contract was issued at the same time did not affect the amount of the premium charged. The insurance was set up and carried on the books of the company the same as any other life insurance; it was reported as such to the Insurance Commissioners of the various states; and the company set up a reserve for the State of Iowa to cover its issuance as required by the laws of such state. The form and terms of the policy were the same as any similar single premium life policy issued by the company and not accompanied by an annuity contract.

"The amount required to purchase the annuity contract was arrived at by determining, according to the mortality table in use, how much, together with the interest which would probably be received, would be required to make the payments specified. To that amount was added the estimated expense which would be incurred in setting up and maintaining the contract. The annuity contract terminated at death, had no value thereafter, and contained no provision for a cash refund of the premium. Under it the company agreed to pay the annuitant $1,178.17 in equal annual payments commencing on the 8th day of January, 1937, and terminating with the last periodic payment before his death. The purchase price of $9,873.20 was paid in one sum. Payment to the annuitant was not

to be due until evidence satisfactory to the company was adduced to show that he was alive at twelve o'clock noon of the day for the payment of the installment claimed, and the contract was assignable. It stated on its face that the basis of the reserve for which funds were to be held under it should be determined on the basis required by the laws of the State of New Jersey but that in no event should such reserve be less than that required by the laws of the state in which it was issued.

"The total amount paid by the decedent to the insurance company was $44,000. The issuance to the decedent of the two policies simultaneously could not involve the insurance company in any loss.

"The insurance company at all times treated the two contracts as two separate transactions, entering upon its records a premium of $34,126.80 in connection with the life insurance policy and $9,873.20 in connection with the annuity contract. It paid a commission of $721.47 to its special agents in connection with their services in writing the life insurance policy and paid them an additional commission of $197.46 in connection with writing the annuity contract.

"On January 4, 1936, decedent executed the will under which his estate was subsequently administered.

"Decedent had been blind in his left eye for approximately 25 years. About January, 19, 1936, while he was attending a directors meeting in Kansas City the eye became swollen, inflamed and irritated so he decided to go to Mayo's and see about it. The eye was removed on January 25, 1936. About a week later he returned to Davenport. Shortly thereafter he began to attend to some of his duties at the cement plant and was there approximately every day until the Sunday before his death on Tuesday, March 31, 1936. The evidence does not disclose the cause of his death though it appears to have been connected with the stomach disorder rather than with the eye.

"The decedent during his lifetime received no payments under the annuity contract. After his death and upon due proof thereof the insurance company paid his wife the sum of $40,000. She also received $2,000 from the Aetna Life Insurance Company, making a total of $42,000 received under policies taken out by the decedent upon his own life.

"In the estate tax return, under Schedule C-2, she reported the receipt of the proceeds of the two policies and deducted $40,000 in accordance with the instructions contained in the return as follows:

"Deduction may be taken at the bottom of the schedule equal to the amount of the proceeds of insurance receivable by beneficiaries other than the estate and returned in the third column, but not exceeding $40,000.

"$2,000 of the amount shown on this schedule was included in the decedent's gross estate."

## Opinion.

After setting out the contentions of the respective parties the Board of Tax Appeals observed in its memorandum opinion that the contentions were in substance the same as those made before the Board in Estate of Anna M. Keller, 39 B.T.A. 1047, and that the facts in the two cases could not be distinguished, and "that the same conclusion must be reached as was reached by the majority in that case". It accordingly decided that there was no deficiency in estate tax and entered judgment for the executrix of the estate.

On this appeal the Commissioner contends that the transaction which was entered into between the decedent Herbert F. Tyler and the Prudential Life Insurance Company constituted an investment by the decedent amounting, for tax purposes, to a transfer of property in contemplation of death and/or intended to take effect in possession or enjoyment at or after his death within the meaning of Section 302 (c), Revenue Act of 1926, 26 U.S.C.A.Int. Rev.Acts page 227. He contends that the amount of $40,000 which was paid by the insurance company on the death of Mr. Tyler to his widow was not receivable by her as insurance upon the life of her husband within the purview of Section 302(g) of the Act, 26 U.S.C.A.Int.Rev.Code, § 811 (g), so as to be exempted from estate tax.

We think the contentions should be sustained and that the estate was taxable as determined by the Commissioner. The issue is a narrow one, and the arguments to be made pro and con are elaborately developed in the majority and minority opinions of the Board of Tax Appeals in Estate of Anna M. Keller, supra. They are extended and amplified in the briefs before us, which have been carefully studied. We think the

controlling considerations are that on a date less than three months prior to Mr. Tyler's death he had passed the age of seventy-one and had been operated upon at the Mayo Clinic in Rochester for carcinoma of the pyloris and had, among other assets, the sum of $44,000, which he then transferred to the Prudential Insurance Company in the consummation of an agreement which was entire in character, by which the company promised him a small but sure income from the money by way of annuity, and the payment of $40,-000 to his widow at his death, and that the money was so paid at his death in fulfillment of the promise. If a scrivener had been called in to draw up the contract detailing what Mr. Tyler agreed to do in respect to his $44,000 and what the company agreed to do in consideration of the receipt of the money, an entire writing would have plainly shown a transfer to the company of $44,000 on account of which $40,-000 was (among other things) to be delivered to the widow at the death of the transferor. As that was the real transaction between Mr. Tyler and the company he must be held to have made a transfer of that amount intended to take effect at his death and his estate was taxable in respect to the money paid to the widow at his death pursuant to the transfer made by him.

The claim that the sum was exempt because it was receivable as insurance on the life of Mr. Tyler is colorable merely. The company assumed no pecuniary risk in respect to the duration of Mr. Tyler's life. It made no examination as to his insurability and he was beyond the age of those whose lives it made a practice of insuring. Practically all life insurance policies include a promise to pay a sum certain at the death of the persons to whom they are issued, and as one of the provisions of the company's $44,000 transaction with Mr. Tyler was that it would pay his widow $40,-000 at his death, the policy form lent itself to cover that part of their agreement. But in the absence of any actual insuring of Mr. Tyler's life there could be and there was no money receivable by the widow as insurance within the meaning of the exemption from the provisions of Section 302 (g).

It is true the so called insurance policy delivered to Mr. Tyler contained the statement that the company thereby insured the life of Mr. Tyler, but that there was in fact no actual intent on the company's part to insure or to take any risk in respect to the life, or on Mr. Tyler's part to obtain any insurance on his life, is plain. The accumulation of arguments upon the details of the numerous provisions found in the policy and annuity forms tends merely to obscure the real nature of the transaction between Mr. Tyler and the company. Of course the printed forms in evidence came within every legal definition of life insurance or annuity contracts. It is also manifest that many options, privileges, advantages, benefits and restrictions are found therein, as in most life and annuity policies. They in no wise prove that any actual insuring of the life was intended by either party and the transaction as it really was in its true substance fixed the tax result.

It is the duty of the court to look through the mere form of such an agreement as that before us and to compel taxation in accord with the substance and reality of a transaction made taxable by congress. In Higgins v. Smith, 308 U.S. 473,[1] 60 S.Ct. 355, 358, 84 L.Ed. ——, the Supreme Court said, "the Government may not be required to acquiesce in the taxpayer's election of that form for doing business which is most advantageous to him. The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation."

The language was used by the court in reference to an attempt of a taxpayer to obtain deduction from gross income for losses through sales to his wholly-owned corporation. Such sales had no substantial effect upon the actual and real income enjoyed by the taxpayer. They were mere sham and fiction as far as his tax obligations in respect to his income were concerned, and we think the same principle is applicable here. Mr. Tyler's real transaction was to deliver his $44,000 into the safe hands of the Prudential Company upon that company's obligation to pay interest by way of annuity during his life, and the principal sum of $40,000 to his wife at

---

[1] Handed down since the Board's decision.

his death. There was no insuring of a human life against loss by death, and the form or semblance of life insurance created by the bisection of the agreement into two documents was unreal. "There is no illusion about the payment of a tax exaction. Each tax, according to a legislative plan, raises funds to carry on government. * * If one or the other factor in any calculation is unreal, it distorts the liability of the particular taxpayer to the detriment or advantage of the entire taxpaying group." Higgins v. Smith, supra. The transfer of his own money, which Mr. Tyler made through the insurance company for his widow's benefit, should not escape taxation on the unreal basis that it was received by her as insurance on his life.

Reversed with direction to sustain deficiency.