ESTATE OF LAFAYETTE MONTGOMERY, DECEASED, TRUST COMPANY OF GEORGIA, ARTHUR L. MONTGOMERY, AND GEORGE A. MONTGOMERY, EXECUTORS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 754–69.    Filed June 14, 1971.

*M. E. Kilpatrick*, for the petitioner.
*James D. Burroughs*, for the respondent.

WITHEY, *Judge:* A deficiency in estate tax has been determined by the Commissioner against petitioner in the amount of $1,761,556.35. Decedent, Lafayette Montgomery, died October 31, 1964.

The primary issue herein is whether under section 2039, I.R.C. 1954, the proceeds of two alleged life insurance policies are to be included in decedent's gross estate in computing the estate tax thereon. An alternative issue raised under section 2035 is not reached herein. Certain other issues raised by the pleadings have been settled by the parties by stipulation which will be given effect under Rule 50.

### FINDINGS OF FACT

All facts which have been stipulated are found accordingly.

Lafayette Montgomery, hereinafter referred to as the decedent, was born on May 6, 1889. He died on October 31, 1964, at the age of 75, a resident of Atlanta, Ga. Arthur L. Montgomery and George A. Montgomery, sons of decedent, and Trust Company of Georgia, duly qualified as executors of the estate of decedent. At the time the petition was filed, the address of the executors was the Trust Company of Georgia Building, Atlanta, Ga.

An estate tax return was filed by the executors of decedent's estate with the district director of internal revenue, Atlanta, Ga., on January 31, 1966. The executors in such return elected to value the assets of decedent as of the date of his death.

On May 4, 1964, decedent created two irrevocable trusts, the trust instrument in each instance being executed by the decedent and the trustees designated in such instruments as follows:

(a) Decedent's son, George A. Montgomery, and Trust Company of Georgia were designated as trustees of one trust; and

(b) Decedent's son, Arthur L. Montgomery, was designated as the trustee for the other trust. Simultaneously with the execution of this trust, Arthur L. Montgomery, pursuant to the provisions of this trust instrument, appointed the Trust Company of Georgia to serve with him as cotrustee. The Trust Company of Georgia accepted such appointment and became a cotrustee of such trust on May 4, 1964. The trusts were created for the benefit of decedent's grandchildren.

On May 5, 1964, decedent made a written application to the National Life Insurance Co., hereinafter referred to as National, for a life annuity on his life. The purchase price of the annuity was to be $2,200,000.

On the same day, the trustees of each of the two irrevocable trusts created by the decedent made written application to National for $1 million of insurance on the life of decedent. Each of the applications was executed by the decedent as the proposed insured.

On the following day, National issued to decedent annuity contract No. 1251522, decedent paying to National a single premium of

$2,200,000. Under the terms of the annuity contract, decedent received $22,682 each month while he lived, the first payment being received by him June 6, 1964. There were no survivor benefits. Payments terminated with the last payment preceding decedent's death.

On the same day, National issued two policies on the life of decedent, each in the amount of $1 million, as follows:

Policy No. 1251520 to George A. Montgomery and Trust Company of Georgia, trustees under one of the trusts created by decedent on May 4, 1964.

Policy No. 1251521 to Arthur L. Montgomery and Trust Company of Georgia, trustees under the other trust created by decedent on May 4, 1964.

Each of the policies are, in form, life insurance policies on the life of the decedent. For reference purposes only, these policies are sometimes hereinafter referred to as life insurance policies.

In order to fund the two irrevocable trusts and to purchase the annuity for $2,200,000, the decedent on May 8, 1964, borrowed $2,500,-000 from the Trust Company of Georgia. The net proceeds of the loan, $2,465,876, were deposited to his personal bank account at the Trust Company of Georgia.

On the same day, decedent made a gift of $132,938 to each of the two irrevocable trusts, evidenced by two personal checks of decedent drawn on his account at the Trust Company of Georgia, each in the amount of $132,938. Each check was payable to the trustees of the trusts. Each such check was paid upon presentation to the bank.

As consideration for the issuance of the policies by National, the trustees of each of the two trusts paid to National $132,938, the same being the first annual premium on each policy. Such payments were made on May 8, 1964, from the funds given to the trusts by decedent. At the time of payment by each of the trusts of the first annual premium on the policy issued to it, the only funds possessed by each trust was $132,938 given to it by the decedent.

National offers a combination nonrefundable life annuity and insurance policy plan under which the life insurance is issued without evidence of insurability. In the case of annual premium life insurance purchased under the plan, National permits the purchase of life insurance in an amount so that the annuity consideration is 110 percent of the face amount of life insurance to be issued.

The decedent in this case was not required to pass a physical examination prior to the issuance of the insurance policies. A physical examination was not necessary because the annuity contract provided National assurance that it would not lose on the transaction regardless of how long or how briefly the decedent might have lived.

National could not suffer an economic loss on the transaction since the premiums provided in the life insurance contracts offset the monthly payments which were made under the terms of the annuity contract. There was no insurance risk involved to National in the transaction.

The identity of the person who applied for or purchased the annuity contract or who applied for or purchased the life insurance contract was immaterial to National. The sole concern of the company was that the annuity contract and the life insurance be on the same life.

National would not have issued the policies to anyone other than decedent unless the decedent consented thereto. The decedent consented to having the policies issued by witnessing the applications of the two trusts therefor.

Prior to the purchase of the annuity-insurance combination plan in this case, National, decedent, and the trustees of the trusts entered into an understanding and agreement with respect to the above transactions relating to the issuance of both the annuity and the life insurance policies.

The policies issued on the life of decedent would not have been issued without the annuity contract since no evidence of insurability was submitted by the decedent. On the basis of decedent's health at May 8, 1964, he would not have been insurable at the standard rate.

At the time the policies were issued, the decedent suffered from advanced pulmonary emphysema, chronic bronchitis, arteriosclerosis, labile hypertension, and hepatitis. His major problem was that of severe pulmonary insufficiency due to emphysema and chronic bronchitis. He died on October 31, 1964, of respiratory infection and congestive heart failure brought on by poor lung function.

On April 15, 1965, decedent's estate filed a gift tax return for the year 1964 on behalf of decedent with the district director of internal revenue, Atlanta, Ga. The gift tax return reported as gifts the $132,938 made to each of the two trusts.

Upon decedent's death on October 31, 1964, National paid the sum of $1,066,469 due under the policies to each of the two trusts. The amount of $66,469 over and above the $1 million face amount of the policies was a refund of part of the annual premium.

Schedule D (Insurance) of the estate tax return filed by the executors on January 31, 1966, specifically excluded policy Nos. 1251520 and 1251521 issued by National on the life of the decedent as part of the gross estate. The estate tax return indicated that the policies were excluded from the gross estate because the trusts were the owners and beneficiaries of the policies.

In Schedule K (Debts of Decedent) of the estate tax return filed for the estate, the sum of $2,465,876 which was the net proceeds of dece-

dent's loan from the Trust Company of Georgia and also the aggregate of amounts paid as premiums for both the annuity and the policies of insurance, was listed as a debt of the estate and was deducted in arriving at the taxable estate under Schedules O (Recapitulation) and P (Taxable Estate—Resident or Citizen). The total gross estate shown was $7,622,026.93.

The respondent determined that the proceeds of $2,132,938 received by the trusts from policy Nos. 1251520 and 1251521 upon the death of the decedent were includable in the gross estate under sections 2035 and 2039 of the Internal Revenue Code of 1954, and since only $265,876 had been reported under Schedule G, the gross estate was understated by the sum of $1,867,062.

ULTIMATE FINDING

The gross estate was understated by the amount of $1,867,062. The life insurance proceeds involved herein were not paid "as insurance under policies on the life of the decedent."

OPINION

The issue presented here is whether the proceeds of life insurance policies on the life of decedent are includable in his gross estate under section 2039 and/or section 2035, I.R.C. 1954.

We find it unnecessary to consider the latter section because we find the former to be controlling under the facts of this case.

In a simultaneous step transaction, decedent on May 4, 1964, created two irrevocable trusts in favor of his grandchildren and on the next day applied to National for an annuity on his life and paid therefor a premium of $2,200,000. Also on May 5, 1964, the trustees of each of the two trusts applied to National for life insurance on the life of decedent in the amount of $1 million each. On the next day, May 6, 1964, both the annuity policy and the two life insurance policies were issued by National. Each of the trusts paid a single annual premium to National in the amount of $132,938, the exact amount of a gift made to each trust by decedent. Under the terms of the annuity, decedent received for each month of his life after its issuance, the amount of $22,682. This payment ceased with the last payment preceding his death. No refund of premium was to be made thereafter nor was any provision made in the annuity policy for survivorship benefits.

By purchase of the annuity, decedent acquired the additional right to either purchase life insurance on his life in the aggregate amount of $2 million or to permit the purchase thereof by the two trusts referred to. Without this right, such insurance would not have been obtained as

decedent was then of such advanced age and in such precarious health as to be uninsurable.

National would not have issued the policies of "life insurance" to the two trusts without the consent of the decedent and likewise would not have done so unless decedent had purchased the annuity. He gave that consent prior to the issuance of the policies and in substance further consented by paying the first annual premium on each through the trusts as conduits.

National, decedent, and the trustees of the two trusts carried through the above transactions as an integrated step transaction as a result of an understanding between them. National suffered no risk of loss as a result of the transactions after decedent's purchase of the annuity, regardless of whether the "life insurance" policies were purchased.

Respondent's primary position is based upon section 2039. His contention is that the "life insurance" involved herein is not life insurance within the meaning of the parenthetical exception contained in section 2039; that therefore the proceeds of "life insurance" policies herein are includable in decedent's gross estate as:

the value of * * * [an] other payment receivable by any beneficiary by reason of surviving the decedent under any form of contract or agreement * * * if, under such contract or agreement, an annuity or other payment was payable to the decedent * * * for his life or for any period not ascertainable without reference to his death. * * *

The key to the applicability of section 2039 rests upon the determination whether his premise is correct.

The word "insurance" is not defined in the 1954 Code or respondent's regulations and we therefore resort to case law for its definition. The word has been discussed by the Supreme Court, particularly with respect to annuity-insurance combinations, in *Helvering* v. *LeGierse*, 312 U.S. 531, in the following language:

the basic question is whether the amounts received here are amounts "receivable as insurance" within the meaning of § 302(g). [Per Act of 1926.]

\*        \*        \*        \*        \*        \*        \*

We think the fair import of subsection (g) is that the amounts must be received as the result of a transaction which involved an actual "insurance risk" at the time the transaction was executed. Historically and commonly insurance involves risk-shifting and risk-distributing. That life insurance is desirable from an economic and social standpoint as a device to shift and distribute risk of loss from premature death is unquestionable. That these elements of risk-shifting and risk-distributing are essential to a life insurance contract is agreed by courts and commentators. See for example: *Ritter* v. *Mutual Life Ins. Co.*, 169 U.S. 139; *In re Walsh*, 19 F. Supp. 567; *Guaranty Trust Co.* v. *Commissioner*, 16 B.T.A. 314; *Ackerman* v. *Commissioner*, 15 B.T.A. 635; Couch, Cyclopedia of Insurance, Vol. 1, § 61; Vance, Insurance. §§ 1–3; Cooley, Briefs on Insurance, 2d edition, Vol. 1, p. 114; Huebner, Life Insurance, Ch. 1. Accordingly, it is

logical to assume that when Congress used the words "receivable as insurance" in § 302(g), it contemplated amounts received pursuant to a transaction possessing these features. *Commissioner* v. *Keller's Estate, supra; Helvering* v. *Tyler, supra; Old Colony Trust Co.* v. *Commissioner,* 102 F. 2d 380; *Ackerman* v. *Commissioner, supra.*

\* \* \* \* \* \* \*

The two contracts must be considered together. To say they are distinct transactions is to ignore actuality, for it is conceded on all sides and was found as a fact by the Board of Tax Appeals that the "insurance" policy would not have been issued without the annuity contract. * * *

\* \* \* \* \* \* \*

Here the total consideration was prepaid and exceeded the face value of the "insurance" policy. The excess financed loading and other incidental charges. Any risk that the prepayment would earn less than the amount paid to respondent as an annuity was an investment risk similar to the risk assumed by a bank; it was not an insurance risk as explained above. * * *

In a companion case to *Helvering* v. *LeGierse, supra; Estate of Keller* v. *Commissioner,* 312 U.S. 543, affirming 113 F. 2d 833 (C.A. 3), the Supreme Court differentiated with some particularity between an investment risk by an insurance company which it held had no bearing upon the question whether its policy as one of life insurance and an insurance risk which it held to be indispensable to a life insurance contract. It was also there held that in using the word "insurance" in the section of the Code there under consideration, Congress had in mind the economic rather than only the contractual aspects of the word. Cf. *Estate of Cora C. Reynolds,* 45 B.T.A. 44, and *Helvering* v. *Tyler,* 111 F. 2d 422 (C.A. 8), affd. 312 U.S. 657.

The basic test in determining whether the integrated transactions before us involved life insurance is whether National in settling its obligations thereunder was exposed to a financial loss. We have found as a fact, based on the evidence before us, that National bore no insurance risk of any kind. It is true that on an annual basis, National was bound to pay decedent $6,308 as annuity payments more than it received as premium payments on "life insurance policies" but the only risk involved was an investment risk, *Helvering* v. *LeGierse, supra,* and *Estate of Keller* v. *Commissioner, supra,* for it had received from decedent as the price of the annuity an amount of $2,200,000 which it was free to invest, to say nothing of the so-called life insurance premiums. Even invested at 1 percent, interest on that amount would far exceed the $6,308 excess. We agree with National's president that, reading the annuity and insurance contracts as one integrated transaction, National bore no risk with respect thereto, be it insurance risk or economic risk.

Having so concluded, it is clear that section 2039 applies. It is stipulated that decedent, under the annuity contract, not only possessed

the right but actually did receive monthly annuity payments which ceased with the last such payment prior to his death. His grandchildren, who were beneficiaries of the two trusts, each received in trust an "other payment" in the form of life insurance proceeds by reason of surviving the decedent. We have found that the transaction here involved grew out of an understanding or agreement between decedent, National, and the trustees of the trusts which in our view fits the statutory (sec. 2039(a)) phrase "under any form of contract or agreement." The language of the statute is clear and unambiguous and for that reason we apply its literal wording to the facts before us.

Section 2039 and acts amendatory thereof are new provisions which first appear in the 1954 Code. The congressional history thereof [1] indicates clearly that Congress thereby sought to include in a decedent's gross estate for estate tax purposes *the full value* of any contract or agreement whereby an annuitant who received lifetime annuity benefits by contribution to the purchase price thereof, at his death left value in or as a result of the agreement remaining to his beneficiaries either by way of lump-sum or periodic payments.

Both houses of Congress in their committee reports on section 2039 used the same language in describing one of the contracts to which the section applies, as follows:

A contract under which the decedent immediately before his death was receiving or was entitled to receive for the duration of his life an annuity, or other stipulated payment, with payments thereunder to continue after his death to a designated beneficiary if surviving the decedent.

Immediately following the examples is the following:

The amount to be included in the gross estate is the value at the decedent's death of the annuity or other payment receivable by the survivor of the decedent, and it is immaterial whether the payments to the survivor are payable in a lump sum, in installments, in the same, or in a greater or lesser amount than the annuity or payment to the decedent.

Inasmuch as we have held section 2039 to be controlling herein, we do not discuss authority cited by petitioner which pertains only to section 2035. The only authority cited and relied on by petitioner with respect to the section 2039 issue is *Fidelity-Phila. Trust Co.* v. *Smith*, 356 U.S. 274. In that case, the Supreme Court had before it an issue arising under section 811(c)(1)(B) of the 1939 Code as to whether annuity payments received by decedent and retained until her death "were income from property transferred by the decedent to her children by the use of the life insurance policies." Section 2039, relating as it does specifically to "an annuity or other payment" did not exist at the date of the transaction which gave rise to that decision, and for that reason, the decision is not controlling

---

[1] H. Rept. No. 1337, 83d Cong., 2d Sess., p. A314 (1954). S. Rept. No. 1622, 83d Cong., 2d Sess., p. 470 (1954).

with respect to the issue before us. It is true that in *Fidelity-Phila. Trust Co.* v. *Smith, supra*, the Supreme Court found an insurance-annuity arrangement, to some extent the same as that before us, involved two separate items of property, the proceeds from which were not to be aggregated in an estate tax computation under section 811 of the 1939 Code, but even though the annuity and the insurance policies here in controversy might be said to have separate entities and values, they each came into being as the result of a single integrated "form of contract or agreement" not dealt with in the Code until the advent of section 2039.

In our view, the arrangement before us consists, in essence, of a single contract for the investment by decedent with National of the aggregate amount of $2,465,876 (annuity premiums plus insurance premiums for 1 year) in return for a fixed monthly payment to decedent for his life with a provision, at his death, that $2 million of the invested sum devolve to his beneficiaries. Application of section 2039 to these facts calls for inclusion of the proceeds of the life insurance herein in decedent's gross estate. We so hold.

*Decision will be entered under Rule 50.*