115 T.C. No. 35

UNITED STATES TAX COURT

ESTATE OF ALBERT STRANGI, DECEASED, ROSALIE GULIG, INDEPENDENT
EXECUTRIX, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4102-99.                     Filed November 30, 2000.


        D formed a family limited partnership (SFLP) and
    transferred assets, including securities, real estate,
    insurance policies, annuities, and partnership
    interests, to SFLP in return for a 99-percent limited
    partnership interest. <u>Held</u>:  (1) The partnership was
    valid under State law and will be recognized for estate
    tax purposes.  (2) Sec. 2703(a), I.R.C., does not apply
    to the partnership agreement.  (3) The transfer of
    assets to SFLP was not a taxable gift.  (4) R's
    expert's opinion as to valuation discounts is accepted.


        <u>Norman A. Lofgren</u> and <u>G. Tomas Rhodus</u>, for petitioner.

        <u>Deborah H. Delgado</u>, <u>Gerald L. Brantley</u>, <u>Sheila R. Pattison</u>,
and <u>William C. Sabin, Jr.</u>, for respondent.

COHEN, Judge:  On December 1, 1998, respondent determined a $2,545,826 deficiency in the Federal estate tax of the estate of Albert Strangi, Rosalie Gulig, independent executrix.  In the alternative, respondent determined a Federal gift tax deficiency of $1,629,947.

After concessions by the parties, the issues for decision are (alternatively):  (1) Whether the Strangi Family Limited Partnership (SFLP) should be disregarded for Federal tax purposes because it lacks business purpose and economic substance; (2) whether the SFLP is a restriction on the sale or use of property that should be disregarded pursuant to section 2703(a)(2); (3) whether the transfer of assets to SFLP was a taxable gift; and (4) if SFLP is not disregarded, the fair market value of decedent's interest in SFLP at the date of death.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

                         FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.  Albert Strangi (decedent) was domiciled in Waco, Texas, at the time of his death, and his estate was administered there.  Rosalie

Strangi Gulig (Mrs. Gulig) resided in Waco, Texas, when the petition in this case was filed.

Decedent was a self-made multimillionaire. He married Genevieve Crowley Strangi (Genevieve Strangi) in the late 1930's and had four children--Jeanne Strangi, Albert T. Strangi, John Strangi, and Mrs. Gulig, collectively referred to herein as the Strangi children. In 1965, the marriage between decedent and Genevieve Strangi was terminated by divorce, and decedent remarried Irene Delores Seymour (Mrs. Strangi). Mrs. Strangi had two daughters from a previous marriage, Angela Seymour and Lynda Seymour.

In 1975, decedent sold his company, Mangum Manufacturing, in exchange for Allen Group stock, and he and Mrs. Strangi moved to Fort Walton Beach, Florida. Mrs. Gulig married Michael J. Gulig (Mr. Gulig) in 1985. Mr. Gulig was an attorney in Waco, Texas, with the law firm of Sheehy, Lovelace and Mayfield, P.C. Mr. Gulig has done a substantial amount of estate planning and is proficient in that field.

On February 19, 1987, decedent and Mrs. Strangi executed wills that named the Strangi children, Angela Seymour, and Lynda Seymour as residual beneficiaries in the event that either decedent or Mrs. Strangi predeceased the other. These wills were prepared by the law offices of Tobolowsky, Prager & Schlinger in Dallas, Texas. Mrs. Strangi also executed the Irene Delores

Strangi Irrevocable Trust (the Trust).  Decedent was designated as the executor of Mrs. Strangi's will and as the trustee of the Trust.

Mrs. Strangi's will provided that her personal effects were to be left to decedent and that life insurance proceeds, employee benefits, and the residuary of her estate should be distributed to the Trust.  The first codicil to Mrs. Strangi's will provided that property she owned in Dallas, Texas, should be distributed to the Jeanne Strangi Brown Trust.  The Trust provided that lifetime distributions would be made to Mrs. Strangi and that, upon her death, (1) her property in Florida should be distributed to Angela Seymour and Lynda Seymour, (2) $50,000 should be distributed to Mrs. Strangi's sister, and (3) the residuary should be distributed to decedent provided that he survived her.

In 1987 and 1988, Mrs. Strangi suffered a series of serious medical problems.  In 1988, decedent and Mrs. Strangi moved to Waco, Texas.  Sylvia Stone (Stone) was hired as decedent's housekeeper.  She also provided assistance with the care of Mrs. Strangi.  On July 19, 1988, decedent executed a power of attorney, naming Mr. Gulig as his attorney in fact.

On July 31, 1990, decedent executed a new will, naming his children as the sole residual beneficiaries if Mrs. Strangi predeceased him.  This will also named Mrs. Gulig and Ameritrust Texas, N.A. (Ameritrust), as coexecutors of decedent's estate.

On December 27, 1990, Mrs. Strangi died in Waco, Texas. Her will was admitted to probate in Texas and was not contested.

In May 1993, decedent had surgery that removed a cancerous mass from his back. That summer, Mr. Gulig took decedent to Dallas to be examined by a physician in the neurology department of Southwest Medical School. Decedent was then diagnosed with supranuclear palsy, a brain disorder that would gradually reduce his ability to speak, walk, and swallow. In September 1993, decedent had prostate surgery.

Formation of Limited Partnership

After decedent's prostate surgery, Mr. Gulig took over the affairs of decedent pursuant to the 1988 power of attorney. Mr. Gulig consulted a probate judge regarding concerns he had about decedent's affairs. On August 11, 1994, Mr. Gulig attended a seminar in Dallas, Texas, provided by Fortress Financial Group, Inc. (Fortress). Fortress trains and educates professionals on the use of family limited partnerships as a tool to (1) reduce income tax, (2) reduce the reported value of property in an estate, (3) preserve assets, and (4) facilitate charitable giving. The Fortress Plan recommends contributing assets to a family limited partnership with a corporate general partner being created for control purposes. The Fortress Plan also suggests that shares of stock of the corporate general partner or an interest in the family limited partnership be donated to a

charity. To facilitate the plan, Fortress licenses the use of copyrighted limited partnership agreements and shareholders' agreements.

Following the Fortress seminar, on August 12, 1994, Mr. Gulig, as decedent's attorney in fact, formed SFLP, a Texas limited partnership, and its corporate general partner, Stranco, Inc. (Stranco), a Texas corporation. Mr. Gulig handled all of the details of the formation, executing the limited partnership agreement and shareholders' agreement using Fortress documents, as well as drafting articles of incorporation and bylaws for Stranco.

The partnership agreement provided that Stranco had the sole authority to conduct the business affairs of SFLP without the concurrence of any limited partner or other general partner. Thus, limited partners could not act on SFLP's behalf without the consent of Stranco. The partnership agreement also allowed SFLP to lend money to partners, affiliates, or other persons or entities.

Mr. Gulig filed the SFLP certificate of limited partnership and the Stranco articles of incorporation with the State of Texas. He also drafted asset transfer documents, dated August 12, 1994, assigning decedent's interest in specified real estate, securities, accrued interest and dividends, insurance policies, annuities, receivables, and partnership interests

(referred to collectively herein as the contributed property) to SFLP for a 99-percent limited partnership interest in SFLP. All of the contributed property was reflected in decedent's capital account. The fair market value of the contributed property was $9,876,929. Approximately 75 percent of that value was attributable to cash and securities.

Mr. Gulig invited decedent's children to participate in SFLP through an interest in Stranco, the corporate general partner of SFLP. Decedent purchased 47 percent of Stranco for $49,350, and Mrs. Gulig purchased the remaining 53 percent of Stranco for $55,650 on behalf of Jeanne Strangi, John Strangi, Albert T. Strangi, and herself. To purchase the Stranco shares, Jeanne Strangi, John Strangi, and Albert T. Strangi each executed unsecured notes dated August 12, 1994, to Mrs. Gulig, with a face amount of $13,912.50 and interest at 8 percent. Stranco contributed $100,333 to SFLP in exchange for a 1-percent general partnership interest. Subsequently, as a result of the downward adjustment of the value of decedent's contributed property, Stranco's capital contribution was reduced on its books by $1,000 to $99,333, and a receivable was recorded indicating $1,000 due from SFLP.

Decedent and the Strangi children made up the initial board of directors of Stranco, and Mrs. Gulig served as president. On August 17, 1994, the Strangi children and Mr. Gulig met to

execute the Stranco shareholders' agreement, bylaws, and a Consent of Directors Authorizing Corporate Action in Lieu of Organizational Meeting that was effective as of August 12, 1994. They also executed a Unanimous Consent of Directors in Lieu of Special Meeting to employ Mr. Gulig to manage the day-to-day affairs of SFLP and Stranco, dated August 12, 1994. Stranco never had formal meetings. All corporate actions were approved by unanimous consent agreements in lieu of actual meetings. On August 18, 1994, McLennan Community College Foundation accepted a gift of 100 Stranco shares from decedent's children "in honor of their father".

From September 1993 until his death, decedent required 24-hour home health care that was provided by Olsten Healthcare (Olsten) and supplemented by Stone. During this time, Stone injured her back. This injury resulted in Stone's having back surgery, and SFLP paid for the surgery. On October 14, 1994, decedent died of cancer at the age of 81.

On December 7, 1994, Peter Gross, an attorney from the law firm of Prager & Benson, P.C., as a representative of decedent's estate, requested that Texas Commerce Bank (TCB), successor in interest to Ameritrust, resign as coexecutor of decedent's estate. The Strangi children also requested that TCB decline to serve as coexecutor and agreed to indemnify TCB for claims related to the estate if it declined to serve as coexecutor.

Accordingly, TCB declined to serve as coexecutor of decedent's estate and renounced its right to appoint a successor coindependent executor. When decedent's will was admitted to probate on April 12, 1995, Mrs. Gulig was appointed as the sole executor of decedent's estate.

Angela Seymour consulted two attorneys regarding the validity of Mrs. Strangi's will during 1994. She never intended to contest decedent's will, and, ultimately, no claim or will contest was filed against decedent's estate.

Partnership Activities

Following the formation of SFLP, various distributions were made by SFLP to decedent's estate and the Strangi children. When distributions were made, corresponding and proportionate distributions were made to Stranco either in cash or in the form of adjusting journal entries. In July 1995, SFLP distributed $3,187,800 to decedent's estate for State and Federal estate and inheritance taxes. Also in 1995 and in 1996, SFLP distributed $563,000 to each of the Strangi children. The distributions were characterized as distributions to decedent's estate.

In May 1996, SFLP divided its primary Merrill Lynch account into four separate accounts in each of the Strangi children's names, giving them control over a proportionate share of the partnership assets. The partnership also extended lines of credit to John Strangi, Albert T. Strangi, and Mrs. Gulig for

$250,000, $400,000, and $100,000, respectively.  In January 1997, SFLP increased John Strangi's line of credit to $350,000 and Albert T. Strangi's line of credit to $650,000.  In November 1997, SFLP advanced to decedent's estate $2.32 million to post bonds with the Internal Revenue Service and the State of Texas in connection with the review of decedent's estate tax return.  In 1998, SFLP made distributions of $102,500 to each of the Strangi children.  The Strangi children had received $2,662,000 in distributions from SFLP as of December 31, 1998.

Estate Tax Return

On January 16, 1996, decedent's Form 706, United States Estate (and Generation Skipping Transfer) Tax Return (estate tax return), was filed by Mr. Gulig.  On the estate tax return, decedent's gross estate was reported as $6,823,582.  This included a $6,560,730 fair market value for SFLP.  For purposes of the estate tax return, SFLP was valued by Appraisal Technologies, Inc., on an "ongoing business", "minority interest basis".  The valuation report arrived at a value before discounts and then applied minority interest discounts totaling 33 percent for lack of marketability and lack of control.

The estate tax return also indicated that decedent had $43,280 in personal debt and other allowable deductions totaling $107,108, leaving a reported taxable estate of $6,673,194.  The estate tax return reported a transfer tax due of $2,522,088.  The

property that was held by SFLP as of the date of death had increased in value to $11,100,922 due to the appreciation of securities, particularly the Allen Group stock.

OPINION

We must decide whether the existence of SFLP will be recognized for Federal estate tax purposes. Respondent argues that, under the business purpose and economic substance doctrines, SFLP should be disregarded in valuing the assets in decedent's estate. Petitioner contends that the business purpose and economic substance doctrines do not apply to transfer tax cases and that SFLP had economic substance and business purpose.

Taxpayers are generally free to structure transactions as they please, even if motivated by tax-avoidance considerations. See Gregory v. Helvering, 293 U.S. 465, 469 (1935); Yosha v. Commissioner, 861 F.2d 494, 497 (7th Cir. 1988), affg. Glass v. Commissioner, 87 T.C. 1087 (1986). However, the tax effects of a particular transaction are determined by the substance of the transaction rather than by its form. In Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978), the Supreme Court stated that "a genuine multiple-party transaction with economic substance * * * compelled or encouraged by business or regulatory realities, * * * imbued with tax-independent considerations, and * * * not shaped solely by tax avoidance features" should be respected for tax purposes. "[T]ransactions which have no

economic purpose or substance other than the avoidance of taxes will be disregarded." Gregory v. Helvering, supra at 469-470; see also Merryman v. Commissioner, 873 F.2d 879 (5th Cir. 1989), affg. T.C. Memo. 1988-72.

Family partnerships must be closely scrutinized by the courts because the family relationship "so readily lends itself to paper arrangements having little or no relationship to reality." Kuney v. Frank, 308 F.2d 719, 720 (9th Cir. 1962); accord Frazee v. Commissioner, 98 T.C. 554, 561 (1992); Harwood v. Commissioner, 82 T.C. 239, 258 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986); Estate of Kelley v. Commissioner, 63 T.C. 321, 325 (1974); Estate of Tiffany v. Commissioner, 47 T.C. 491, 499 (1967); see also Helvering v. Clifford, 309 U.S. 331, 336-337 (1940). Family partnerships have long been recognized where there is a bona fide business carried on after the partnership is formed. See, e.g., Drew v. Commissioner, 12 T.C. 5, 12-13 (1949). Mere suspicion and speculation about a decedent's estate planning and testamentary objectives are not sufficient to disregard an agreement in the absence of persuasive evidence that the agreement is not susceptible of enforcement or would not be enforced by parties to the agreement. Cf. Estate of Hall v. Commissioner, 92 T.C. 312, 335 (1989).

The estate contends that there were "clear and compelling" nontax motives for creating SFLP, including the provision of a flexible and efficient means by which to manage and protect decedent's assets. Specifically, the estate argues that its business purposes for forming SFLP were (1) to reduce executor and attorney's fees payable at the death of decedent, (2) to insulate decedent from an anticipated tort claim and the estate from a will contest (by creating another layer through which creditors must go to reach assets conveyed to the partnership), and (3) to provide a joint investment vehicle for management of decedent's assets. We agree with respondent that there are reasons to be skeptical about the nontax motives for forming SFLP.

We are skeptical of the estate's claims of business purposes related to executor and attorney's fees or potential tort claims. Mr. Gulig testified that, on various social occasions, he consulted with a former probate judge about decedent's anticipated estate. Those consultations, however, were not related in time or purpose to the formation of SFLP. In our view, the testimony about consultation is similar to the evidence described in Estate of Baron v. Commissioner, 83 T.C. 542, 555 (1984), affd. 798 F.2d 65 (2d Cir. 1986), to wit, the "'consultation' was mere window dressing to conceal tax motives."

We are not persuaded by the testimony that SFLP was formed to protect assets from will contests by Angela or Lynda Seymour or from a potential tort claim by Stone. The Seymour claims were stale when the partnership was formed, and they never materialized. There was no direct corroboration that Stone was injured by decedent while she was caring for him or any indication that Stone ever threatened litigation.

We also do not believe that a "joint investment vehicle" was the purpose of the partnership. Mr. Gulig took over control of decedent's affairs in September 1993, under the 1988 power of attorney, and Mr. Gulig continued to manage decedent's assets through his management responsibilities in Stranco. Petitioner concedes, in disputing respondent's alternative claim of gift tax liability, that "directly or indirectly, the Decedent ended up with 99.47% of the Partnership, having put in essentially 99.47% of the capital."

The formation and subsequent control of SFLP were orchestrated by Mr. Gulig without regard to "joint enterprise". He formed the partnership and the corporation and then invited Mrs. Gulig's siblings, funded by her, to invest in the corporation. The Strangi children shared in managing the assets only after and to the extent that the Merrill Lynch account was fragmented in accordance with their respective beneficial interests.

The nature of the assets that were contributed to SFLP supports the conclusion that management of those assets was not the purpose of SFLP. There were no operating business assets contributed to SFLP. Decedent transferred cash, securities, life insurance policies, annuities, real estate, and partnership interests to SFLP. The cash and securities approximated 75 percent of the value of the assets transferred. No active business was conducted by SFLP following its formation.

The actual control exercised by Mr. Gulig, combined with the 99-percent limited partnership interest in SFLP and the 47-percent interest in Stranco, suggest the possibility of including the property transferred to the partnership in decedent's estate under section 2036. See, e.g., Estate of Reichardt v. Commissioner, 114 T.C. 144 (2000). Section 2036 is not an issue in this case, however, because respondent asserted it only in a proposed amendment to answer tendered shortly before trial. Respondent's motion to amend the answer was denied because it was untimely. Applying the economic substance doctrine in this case on the basis of decedent's continuing control would be equivalent to applying section 2036(a) and including the transferred assets in decedent's estate. As discussed below, absent application of section 2036, Congress has adopted an alternative approach to perceived valuation abuses.

SFLP was validly formed under State law. The formalities were followed, and the proverbial "i's were dotted" and "t's were crossed". The partnership, as a legal matter, changed the relationships between decedent and his heirs and decedent and actual and potential creditors. Regardless of subjective intentions, the partnership had sufficient substance to be recognized for tax purposes. Its existence would not be disregarded by potential purchasers of decedent's assets, and we do not disregard it in this case.

Section 2703(a)(2)

Section 2703(a) provides as follows:

> SEC. 2703. (a) General Rule.--For purposes of this subtitle, the value of any property shall be determined without regard to--
>
> > (1) any option, agreement, or other right to acquire or use the property at a price less than the fair market value of the property (without regard to such option, agreement, or right), or
> >
> > (2) any restriction on the right to sell or use such property.

Noting that a right or restriction may be implicit in the capital structure of an entity, see sec. 25.2703-1(a)(2), Gift Tax Regs., respondent argues that section 2703(a)(2) applies to disregard SFLP for transfer tax purposes. Respondent further argues that the SFLP agreement does not satisfy the "safe harbor" exception in section 2703(b).

Respondent's brief states:

Congress recognized substantial valuation abuse in the law as it existed prior to the enactment of I.R.C. sec. 2036(c) in 1987. In 1990 Congress replaced section 2036(c) with a new Chapter 14, including sections 2701 through 2704, which sets out special valuation rules for transfer tax purposes. It intended these new sections to target transfer-tax valuation abuses in the intra-family transfers more effectively while relieving taxpayers of section 2036(c)'s broad sweep. It wanted to value property interests more accurately when they were transferred, instead of including previously transferred property in the transferor's gross estate. "Discussion Draft" Relating to Estate Valuation Freezes: Hearing Before the House Comm. on Ways and Means, 101st Cong. 2d Sess. 102 (April 24, 1990) [House hearing]; Estate Freezes: Hearing on "Discussion Draft" Before the Subcomm. on Energy and Agricultural Taxation and Subcomm. on Taxation and Debt Management of the Senate Comm. on Finance, 101st Cong. 1233 (June 27, 1990) [Senate hearing].

The new special valuation rules in Chapter 14 departed substantially from the hypothetical willing buyer-willing seller standard. The Treasury Department recognized that valuing nonpublicly traded assets in family transactions for transfer tax purposes presented a significant problem. It testified to Congress that applying the hypothetical standard of a willing buyer-willing seller to family transactions allowed significant amounts to escape taxation. Senate hearing at 15.

Congress enacted section 2703(a) to address abusive intra-family situations. Section 2703(a)(1) addresses burdening a decedent's property with options to purchase at less than fair market value. Section 2703(a)(2), which applies to this case, addresses other restrictions that reduce the value of a decedent's property for estate tax purposes but not in the hands of the beneficiary. Congress contemplated that the section would apply to "any restriction, however created," including restrictions implicit in the capital structure of a partnership or contained in a partnership agreement, articles of incorporation, corporate bylaws or a shareholders' agreement. Informal Senate Report on S. 3209, 101st Cong., 2d Sess. (1990), 136 Cong. Rec. S15777 (October 18, 1990).

> Thus, it intended the word "restriction" in section 2703(a)(2) to be read as broadly as possible. <u>See</u> Treas. Reg. sec. 25.2703-1 (a lease from a father to son will to be disregarded for transfer tax valuation purposes because it is not similar to arm's-length transactions among unrelated parties. [Fn. ref. omitted.]

Respondent next argues that the term "property" in section 2703(a)(2) means the underlying assets in the partnership and that the partnership form is the restriction that must be disregarded. Unfortunately for respondent's position, neither the language of the statute nor the language of the regulation supports respondent's interpretation. Absent application of some other provision, the property included in decedent's estate is the limited partnership interest and decedent's interest in Stranco.

In <u>Kerr v. Commissioner</u>, 113 T.C. 449 (1999), the Court dealt with a similar issue with respect to interpretation of section 2704(b). Sections 2703 and 2704 were enacted as part of chapter 14, I.R.C., in 1990. See Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, 104 Stat. 1388. However, as we indicated in <u>Kerr v. Commissioner</u>, <u>supra</u> at 470-471, and as respondent acknowledges in the portion of his brief quoted above, the new statute was intended to be a targeted substitute for the complexity, breadth, and vagueness of prior section 2036(c); and Congress "wanted to value property interests more accurately when

they were transferred, instead of including previously transferred property in the transferor's gross estate." Treating the partnership assets, rather than decedent's interest in the partnership, as the "property" to which section 2703(a) applies in this case would raise anew the difficulties that Congress sought to avoid by repealing section 2036(c) and replacing it with chapter 14. We conclude that Congress did not intend, by the enactment of section 2703, to treat partnership assets as if they were assets of the estate where the legal interest owned by the decedent at the time of death was a limited partnership or corporate interest. See also Estate of Church v. United States, 85 AFTR 2d 2000-804, 2000-1 USTC par. 60,369 (W.D. Tex. 2000). Thus, we need not address whether the partnership agreement satisfies the safe harbor provisions of section 2703(b). Respondent did not argue separately that the Stranco shareholders' agreement should be disregarded for lack of economic substance or under section 2703(a).

Gift at the Inception of SFLP

Respondent determined in the statutory notice and argues in the alternative that, if the partnership is recognized for estate tax purposes, decedent made a gift when he transferred property to the partnership and received in return a limited partnership interest of lesser value. Using the value reported by petitioner on the estate tax return, if decedent gave up property worth in

excess of $10 million and received back a limited partnership interest worth approximately $6.5 million, he appears to have made a gift equal to the loss in value. (Petitioner now claims a greater discount, as discussed below.) In analogous circumstances involving a transfer to a corporation, the Court of Appeals in Kincaid v. United States, 682 F.2d 1220 (5th Cir. 1982), held that there was a taxable gift and awarded summary judgment to the Government. The Court of Appeals rejected the discounts claimed by the taxpayer, stating that no business person "would have entered into this transaction, * * * [thus] the 'moving impulse for the * * * transaction was a desire to pass the family fortune on to others'". Id. at 1225 (quoting Robinette v. Helvering, 318 U.S. 184, 187-188 (1943)). The Court of Appeals in Kincaid concluded that, while there may have been business reasons for the taxpayer to transfer land to a family corporation in exchange for stock, "there was no business purpose, only a donative one, for Mrs. Kincaid to accept less value in return than she gave up." Id. at 1226.

In this case, the estate claims that the assets were transferred to SFLP for the business purposes discussed above. Following the formation of SFLP, decedent owned a 99-percent limited partnership interest in SFLP and 47 percent of the corporate general partner, Stranco. Even assuming arguendo that decedent's asserted business purposes were real, we do not

believe that decedent would give up over $3 million in value to achieve those business purposes.

Nonetheless, in this case, because we do not believe that decedent gave up control over the assets, his beneficial interest in them exceeded 99 percent, and his contribution was allocated to his own capital account, the instinctive reaction that there was a gift at the inception of the partnership does not lead to a determination of gift tax liability. In a situation such as that in Kincaid, where other shareholders or partners have a significant interest in an entity that is enhanced as a result of a transfer to the entity, or in a situation such as Shepherd v. Commissioner, 115 T.C. __, __ (2000) (slip. op. at 21), where contributions of a taxpayer are allocated to the capital accounts of other partners, there is a gift. However, in view of decedent's continuing interest in SFLP and the reflection of the contributions in his own capital account, he did not transfer more than a minuscule proportion of the value that would be "lost" on the conveyance of his assets to the partnership in exchange for a partnership interest. See Kincaid v. United States, supra at 1224. Realistically, in this case, the disparity between the value of the assets in the hands of decedent and the alleged value of his partnership interest reflects on the credibility of the claimed discount applicable to the partnership interest. It does not reflect a taxable gift.

Valuation of Decedent's Limited Partnership Interest

For the reasons stated above, resolution of this case requires that we determine the fair market value of decedent's limited partnership interest in SFLP. For reasons stated above and below, we do not believe that the discounts claimed by petitioner in this case are reasonable.

Fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. See United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs. Under the hypothetical willing buyer-willing seller standard, decedent's interest cannot be valued by assuming that sales would be made to any particular person. See Estate of Bright v. United States, 658 F.2d 999, 1001 (5th Cir. 1981). On the other hand, transactions that are unlikely and plainly contrary to the economic interest of a buyer or seller are not reflective of fair market value. See Estate of Curry v. United States, 706 F.2d 1424, 1429 (7th Cir. 1983); Estate of Newhouse v. Commissioner, 94 T.C. 193, 232 (1990); Estate of Hall v. Commissioner, 92 T.C. 312, 337 (1989); Estate of O'Keeffe v. Commissioner, T.C. Memo. 1992-210.

The trier of fact determining fair market value must weigh all relevant evidence and draw appropriate inferences. See Hamm

v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347; Estate of Andrews v. Commissioner, 79 T.C. 938 (1982).  Reviewing the facts of this case, at the date of death, decedent owned a 99-percent limited partnership interest in SFLP and a 47-percent interest in Stranco, the 1-percent owner and general partner of SFLP.  Approximately 75 percent of the partnership's value consisted of cash and securities.  It is unlikely and plainly contrary to the interests of a hypothetical seller to sell these interests separately and without regard to the liquidity of the underlying assets.  SFLP was not a risky business or one in which the continuing value of the assets depended on continuing operations.

Each of the parties in this case presented expert valuation testimony.  The experts agreed that the appropriate methodology was the "net asset value" approach.  Each expert determined and applied a minority interest discount and a marketability discount to the net asset value of the partnership assets.

Both petitioner's expert and respondent's expert determined that a 25-percent lack of marketability discount was appropriate. Only respondent's expert, however, considered decedent's ownership of Stranco stock.  We agree with respondent that the relationship between the limited partnership interest and the interest in Stranco cannot be disregarded.  The entities were

created as a unit and operated as a unit and were functionally inseparable.

In valuing decedent's 99-percent limited partnership interest on the date of death, respondent's expert applied an 8-percent minority interest discount and a 25-percent marketability discount, to reach a combined (rounded) discount of 31 percent. Respondent's expert valued decedent's 47-percent interest in Stranco by applying a 5-percent minority interest discount and a 15-percent marketability discount, to reach a combined (rounded) discount of 19 percent. Petitioner's expert applied a 25-percent minority interest discount and a 25-percent marketability discount, resulting in an effective total discount of 43.75 percent to the partnership. He did not value petitioner's interest in Stranco because he believed that the relationship was irrelevant. In our view, his result is unreasonable and must be rejected.

Respondent's expert selected the lower minority interest discount after considering the effective control of the limited partnership interest and the interest in Stranco and considering the detailed provisions of the partnership agreement and the shareholders' agreement. He examined closed-end funds, many of which are traded on major exchanges, and determined the range of discounts from net asset value for those funds. He selected a discount toward the lower end of the range. His analysis was

well documented and persuasive.  As respondent notes, normally a control premium would apply to an interest having effective control of an entity.

Petitioner argues that consideration of the stock interest in Stranco in valuing the limited partnership interest is erroneous because the shareholders' agreement granted the corporation and the other shareholders the right to purchase a selling shareholder's stock.  While the shareholders' agreement may be a factor to be considered in determining fair market value, it does not persuade us that a hypothetical seller would not market the interest in the limited partnership and the interest in the corporation as a unit or that a transaction would actually take place in which only the partnership interest or the stock interest was transferred.  Under the circumstances, the shareholders' agreement is merely a factor to be taken into account but not to be given conclusive weight.  Cf. Estate of Hall v. Commissioner, 92 T.C. 312, 335 (1989); Estate of Lauder v. Commissioner, T.C. Memo. 1994-527.

In view of our rejection of respondent's belated attempt to raise section 2036 and respondent's request that we disregard the partnership agreement altogether, we are constrained to accept the evidence concerning discounts applicable to decedent's interest in the partnership and in Stranco as of the date of death.  We believe that the result of respondent's expert's

discounts may still be overgenerous to petitioner, but that result is the one that we must reach under the evidence and under the applicable statutes.

We have considered the other arguments of the parties, and they do not affect our analysis. To reflect the foregoing and the stipulated adjustments,

<u>Decision will be entered under Rule 155</u>.

Reviewed by the Court.

CHABOT, WHALEN, COLVIN, HALPERN, CHIECHI, and THORNTON, <u>JJ</u>., agree with this majority opinion.

LARO, <u>J</u>., concurs in this opinion.

WELLS, C.J., concurring:  Respectfully, although I concur in the result reached by the majority in the instant case, I wish to express my disagreement with the majority's application of the economic substance doctrine.  The majority rejects the alleged business purposes underlying the formation of the disputed partnership but then concludes that the partnership "had sufficient substance to be recognized for tax purposes", majority op. p. 16, because the partnership was validly formed under State law, which altered the legal relationships between the decedent and others.

I believe that the majority's stated reasons for holding that the partnership had substance misapplies the economic substance doctrine.  In cases such as ACM Pshp. v. Commissioner, 157 F.3d 231 (3d Cir. 1998), affg. in part and revg. in part on another issue T.C. Memo. 1997-115, where the economic substance doctrine is applied to deny income tax benefits, the doctrine is applied regardless of the validity of the partnership under State law.  Because the majority has rejected the alleged business purposes underlying the formation of the partnership in issue in the instant case, a proper application of the economic substance doctrine, if it were to apply, would ignore the partnership and disallow the discounts for minority interest and lack of marketability.

I believe that, rather than holding that the economic substance doctrine is satisfied in the instant case, the Court should conclude that the economic substance doctrine does not apply to disregard a validly formed entity where the issue is the value for Federal gift and estate tax purposes of the interest transferred in that entity.  In that regard, I agree with Judge Foley's concurring opinion in <u>Knight v. Commissioner</u>, 115 T.C. ___, ___ (2000).

FOLEY, <u>J</u>., agrees with this concurring opinion.

PARR, J., dissenting:  The majority, citing <u>Frank Lyon Co. v. United States</u>, 435 U.S. 561, 583-584 (1978), states:  "the tax effects of a particular transaction are determined by the substance of the transaction rather than by its form."  Majority op. p. 11.  The majority also cites a long line of cases, see <u>Helvering v. Clifford</u>, 309 U.S. 331, 336 (1940); <u>Kuney v. Frank</u>, 308 F.2d 719, 720 (9th Cir. 1962); <u>Frazee v. Commissioner</u>, 98 T.C. 554, 561 (1992); <u>Harwood v. Commissioner</u>, 82 T.C. 239, 258 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986); <u>Estate of Kelly v. Commissioner</u>, 63 T.C. 321, 325 (1974); <u>Estate of Tiffany v. Commissioner</u>, 47 T.C. 491, 499 (1967), that require the Court to closely scrutinize family partnerships "because the family relationship 'so readily lends itself to paper arrangements having little or no relationship to reality.'" Majority op. p. 12 (quoting <u>Kuney v. Frank</u>, 308 F.2d 719, 720 (9th Cir. 1962)).

The majority is "skeptical of the estate's claims of business purposes related to executor and attorney's fees or potential tort claims", majority op. p. 13, is not persuaded that SFLP was formed to protect assets from will contests, does not believe that a joint investment vehicle was the purpose of the partnership, found that the formation and control of SFLP were orchestrated by Mr. Gulig without regard to joint enterprise, and

found that the management of the assets contributed to SFLP was not the purpose of SFLP.

In this case, the facts clearly demonstrate that the paper arrangement, the written partnership agreement, had no relationship to the reality of decedent's ownership and control of the assets contributed to the partnership. Although under the partnership agreement a limited partner could not demand a distribution of partnership capital or income, the partnership (1) paid for Stone's surgery when she injured her back while caring for decedent, (2) distributed $3,187,800 to decedent's estate for State and Federal estate and inheritance taxes, (3) distributed $563,000 in 1995 and 1996 and $102,500 in 1998 to each of the Strangi children, (4) divided its primary Merrill Lynch account into four separate accounts in each of the Strangi children's names, (5) extended lines of credit to John Strangi, Albert T. Strangi, and Mrs. Gulig, and (6) advanced to decedent's estate $3.32 million to post bonds with the Internal Revenue Service. It is clear that, contrary to the written partnership agreement, decedent and his successor in interest to his partnership interest (decedent's estate) had the ability to withdraw funds at will. If a hypothetical third party had offered to purchase the assets held by the partnership for the full fair market value of those assets, there is little doubt

that decedent could have had the assets distributed to himself to complete the sale.

The majority, however, holds that, because the formalities were followed and SFLP was validly formed under State law, the partnership had sufficient substance to be recognized for tax purposes. The majority then values decedent's partnership interest as if the restrictions in the written partnership agreement were actually binding on the partners. The majority states, "The actual control exercised by Mr. Gulig, combined with the 99-percent limited partnership interest in SFLP and the 47-percent interest in Stranco, suggest the possibility of including the property transferred to the partnership in decedent's estate under section 2036." Majority op. p. 15. It seems incongruous that for purposes of section 2036 this Court could look to the actual control decedent exercised over the assets of the partnership, but for purposes of determining the appropriate discounts for valuing decedent's interest in the partnership this Court is limited to the written partnership agreement.

Assuming, arguendo, that the partnership must be recognized for Federal estate tax purposes, I would value the interest under the agreement that existed in fact, rather than under the written partnership agreement that had no relationship to the reality of decedent's ownership and control of the assets contributed to the partnership.

A person who maintains control over the ultimate disposition of property is, in practical effect, in a position similar to the actual owner of the property. See, e.g., Estate of Kurz v. Commissioner, 101 T.C. 44, 50-51, 59-60 (1993), supplemented by T.C. Memo. 1994-221, affd. 68 F.3d 1027 (7th Cir. 1995). The Court should not allow a taxpayer who is not in fact limited by an agreement to claim a discount that is premised on that very limitation. A minority discount is allowed because a limited partner cannot cause the partnership to make distributions. Decedent and decedent's estate in fact caused the partnership to make distributions at will. The minority discount is not appropriate in this case.

Additionally, a discount for lack of marketability is allowed because a hypothetical third party would pay less for the partnership interest than for the assets. But in this case, under the actual partnership arrangement, decedent could have had all the assets distributed to himself and then sold them directly to the buyer. The lack of marketability discount, therefore, also is inappropriate in this case. Because the actual partnership arrangement provided for distributions at will, I would value the partnership interest at the value of the partnership's assets without any discount.

For the above reasons, I respectfully dissent.

BEGHE and MARVEL, JJ., agree with this dissenting opinion.

RUWE, J., dissenting:  Decedent transferred property to a newly formed partnership in return for a 99-percent limited partnership interest.  This was done 2 months before he died, as part of a plan to reduce tax on his estate.  The estate presented testimony to support its argument that these actions were taken for business purposes.  The trial judge clearly rejects these arguments and describes the testimony offered by the estate as "mere window dressing to conceal tax motives."  Majority op. p. 13.  Tax savings was the only motivating factor for transferring property to the partnership.  Nevertheless, the majority validates this scheme by valuing decedent's 99-percent partnership interest at 31 percent below the value of the property that decedent transferred to the partnership.

Respondent argues that if the partnership interest that decedent received is to be valued at 31 percent less than the value of the property that decedent transferred to the partnership, then the difference should be considered to be a gift.  The majority rejects respondent's gift argument.[1]

---

[1]One of the reasons given by the majority for rejecting respondent's gift argument is "we do not believe that decedent gave up control over the assets".  Majority op. p. 21.  This finding is inconsistent with the majority's allowance of a 31 percent discount.  If decedent owned assets worth $9,876,929, transferred legal title to those assets to a partnership in which he had a beneficial interest that exceeded 99 percent, and thereafter retained control over the transferred assets, how could the value of his property rights be 31 percent less after

(continued...)

Respondent's gift tax argument is supported by the applicable statutes, regulations, and controlling opinions.  If the value of the property that decedent transferred to the partnership was more than the value of the consideration that he received, and the transfer was not made for bona fide nontax business reasons, then the amount by which the value of the property transferred exceeds the value of the consideration is deemed to be a gift pursuant to section 2512(b).

Section 2512(b) provides:

SEC. 2512.  VALUATION OF GIFTS.

> (b) Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift, and shall be included in computing the amount of gifts made during the calendar year.

Section 25.2512-8, Gift Tax Regs., provides:

> Sec. 25.2512-8.  Transfers for insufficient consideration.--Transfers reached by the gift tax are not confined to those only which, being without a valuable consideration, accord with the common law concept of gifts, but embrace as well sales, exchanges, and other dispositions of property for a consideration to the extent that the value of the property transferred by the donor exceeds the value in money or money's worth of the consideration given therefor.
> * * *

---

[1](...continued)
the transfer?  Certainly, a hypothetical willing buyer and seller with reasonable knowledge of the relevant facts would be aware that decedent's property interests included control over the assets.  The majority's analysis fails to adequately explain this apparent anomaly.

Transactions made in the ordinary course of business are exempt from the above gift tax provisions. Thus, section 25.2512-8, Gift Tax Regs., provides:

> However, a sale, exchange, or other transfer of property made in the ordinary course of business (a transaction which is bona fide, at arm's length, and free from any donative intent), will be considered as made for an adequate and full consideration in money or money's worth. * * *

The Supreme Court has described previous versions of the gift tax statutes (section 501 imposing the tax on gifts and section 503 which is virtually identical to present section 2512(b)) in the following terms:

> Sections 501 and 503 are not disparate provisions. Congress directed them to the same purpose, and they should not be separated in application. Had Congress taxed "gifts" simpliciter, it would be appropriate to assume that the term was used in its colloquial sense, and a search for "donative intent" would be indicated. But Congress intended to use the term "gifts" in its broadest and most comprehensive sense. H. Rep. No. 708, 72d Cong., 1st Sess., p.27; S. Rep. No. 665, 72d Cong., 1st Sess., p.39; cf. Smith v. Shaughnessy, 318 U.S. 176; Robinette v. Helvering, 318 U.S. 184. Congress chose not to require an ascertainment of what too often is an elusive state of mind. For purposes of the gift tax it not only dispensed with the test of "donative intent." It formulated a much more workable external test, that where "property is transferred for less than an adequate and full consideration in money or money's worth," the excess in such money value "shall, for the purpose of the tax imposed by this title, be deemed a gift..." And Treasury Regulations have emphasized that common law considerations were not embodied in the gift tax.

> To reinforce the evident desire of Congress to hit all the protean arrangements which the wit of man can devise that are not business transactions within the

meaning of ordinary speech, the Treasury Regulations make clear that no genuine business transaction comes within the purport of the gift tax by excluding "a sale, exchange, or other transfer of property made in the ordinary course of business (a transaction which is bona fide, at arm's length, and free from any donative intent)." Treas. Reg. 79 (1936 ed.) Art. 8. <u>Thus on finding that a transfer in the circumstances of a particular case is not made in the ordinary course of business, the transfer becomes subject to the gift tax to the extent that it is not made "for an adequate and full consideration in money or money's worth."</u> See 2 Paul, Federal Estate and Gift Taxation (1942) p. 1113. [<u>Commissioner v. Wemyss</u>, 324 U.S. 303, 306 (1945); fn. ref. omitted; emphasis added.]

In light of what the Supreme Court said, the estate attempted to portray the transfer of property to the partnership as a business transaction. The majority soundly rejects this as a masquerade. Indeed, it is clear that the transfer was made to reduce the value of decedent's assets for estate tax purposes, while at the same time allowing the full value of decedent's property to pass to his children.

The Supreme Court has described the objective of the gift tax as follows:

The section taxing as gifts transfers that are not made for "adequate and full [money] consideration" aims to reach those transfers which are withdrawn from the donor's estate. * * * [<u>Commissioner v. Wemyss</u>, <u>supra</u> at 307.]

Under the applicable gift tax provisions and Supreme Court precedent, it is unnecessary to consider what decedent's children received on the date of the transfer in order to determine the value of the deemed gift under section 2512(b). Indeed, it is

not even necessary to identify the donees.  Section 25.2511-2(a),

Gift Tax Regs., provides:

> Sec. 25.2511-2.  Cessation of donor's dominion and
> control.--(a) The gift tax is not imposed upon the
> receipt of the property by the donee, nor is it
> necessarily determined by the measure of enrichment
> resulting to the donee from the transfer, nor is it
> conditioned upon ability to identify the donee at the
> time of the transfer.  On the contrary, the tax is a
> primary and personal liability of the donor, is an
> excise upon his act of making the transfer, is measured
> by the value of the property passing from the donor,
> and attaches regardless of the fact that the identity
> of the donee may not then be known or ascertainable.

In Robinette v. Helvering, 318 U.S. 184 (1943), the taxpayer

argued that there could be no gift of a remainder interest where

the putative remaindermen (prospective unborn children of the

grantor) did not even exist at the time of the transfer.  The

Supreme Court rejected this argument stating that the gift tax is

a primary and personal liability of the donor measured by the

value of the property passing from the donor.

This case involves an attempt by a dying man (or his

attorney) to transfer property to a partnership in consideration

for a 99-percent partnership interest that would be valued at

substantially less than the value of the assets transferred to

the partnership, while at the same time assuring that 100 percent

of the value of the transferred assets would be passed to

decedent's beneficiaries.  Assuming, as the majority has found,

that decedent's partnership interest was worth less than the

property he transferred,[2] section 2512(b) should be applied. Pursuant to that section the excess of the value of the property decedent transferred to the partnership over the value of the consideration he received is "deemed a gift" subject to the gift tax. By failing to apply section 2512(b) in this case, the majority thwarts the purpose of section 2512(b) which the Supreme Court described as "the evident desire of Congress to hit all the protean arrangements which the wit of man can devise that are not business transactions". Commissioner v. Wemyss, supra at 306.

PARR, BEGHE, GALE, and MARVEL, JJ., agree with this dissenting opinion.

---

[2]The majority's allowance of a 31-percent discount is in stark contrast to its rejection of respondent's gift argument on the ground that decedent did not give up control of the assets when he transferred them to the partnership. See majority op. p. 21. While the basis for finding that decedent did not give up control of the assets is not fully explained, it appears not to be based on the literal terms of the partnership agreement which gave control to Stranco, the corporate general partner. Decedent owned only 47 percent of the Stranco stock. Since the majority also rejects respondent's economic substance argument, the only other conceivable basis for concluding that decedent retained control over the assets that he contributed to the partnership is that the partnership arrangement was a factual sham. If that were the case, the partnership arrangement itself would be "mere window dressing" masking the true facts and the terms of the partnership arrangement should be disregarded. In an analogous situation the Court of Appeals for the Tenth Circuit disregarded the written terms of a transfer document as fraudulent. See Heyen v. United States, 945 F.2d 359 (10th Cir. 1991).

BEGHE, J., dissenting:  Having joined the dissents of Judges Parr and Ruwe, I write separately to describe another path to the conclusion that SFLP had no effect on the value of Mr. Strangi's gross estate under sections 2031 and 2033.  In my view, the property to be valued is the property originally held by Mr. Strangi, the so-called contributed property.  Notwithstanding that the property in question may have been contributed to a partnership formed on Mr. Strangi's behalf in exchange for a 99-percent limited partnership interest, we're not bound to accept the estate's contention that the property to be valued is its interest in SFLP, subject to all the disabilities and resulting valuation discounts entailed by ownership of an interest in a limited partnership.  Instead, the facts of this case invite us to use the end-result version of the step-transaction doctrine to treat the underlying partnership assets--the property originally held by the decedent--as the property to be valued for estate tax purposes.

The value of property for transfer tax purposes is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.  See United States v. Cartwright, 411 U.S. 546, 550-551 (1973); sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2512-1, Gift Tax Regs.  The majority state that SFLP's existence "would not be

disregarded by potential purchasers of decedent's assets"; the majority also suggest that this is why the partnership should not be disregarded as a substantive sham.  See majority op. p. 16.

I support the use of substance over form analysis to decide whether a transaction qualifies for the tax-law defined status its form suggests.  A formally correct transaction without a business purpose may not be a "reorganization", and a title holder of property without an economic interest may not be the tax "owner".  However, I share the majority's concerns about using substance over form analysis to alter the conclusion about a real-world fact, such as the fair market value of property, which the law tells us is the price at which the property actually could be sold.[1]

---

[1] Against the grain of the majority's conclusions that the SFLP arrangements were neither a factual sham nor a substantive sham, I would observe that another "conceivable basis for concluding that decedent retained control over the assets that he contributed to the partnership" (Ruwe, J., dissenting opinion page 38 note 2) are the multiple roles played by Mr. Gulig, who had decedent's power of attorney and caused himself to be employed by Stranco to manage the affairs of SFLP, and the tacit understanding of the other family members that he would look out for their interests.  Although I would agree with the majority that use of substantive sham analysis may not be appropriate in transfer tax cases, I believe that factual sham analysis can be used in appropriate cases in the transfer tax area and that the case at hand is one of those cases; the terms of the SFLP partnership agreement should be disregarded because the parties to the agreement didn't pay any attention to them.  Cf. Heyen v. United States, 945 F.2d 359 (10th Cir. 1991).  To adapt to the case at hand the hypothetical posed by the Court of Appeals in Citizens Bank & Trust Co. v. Commissioner, 839 F.2d 1249, 1254-
(continued...)

Although my approach to the case at hand employs a step-transaction analysis, which is a variant of substance over form, I do not use that analysis to conclude anything about fair market value.  Instead, I use it to identify the property whose transfer is subject to tax.  Step-transaction analysis has often been used in transfer tax cases to identify the transferor or the property transferred.

The step-transaction doctrine is a judicially created concept that treats a series of formally separate "steps" as a single transaction if those steps are "in substance integrated, interdependent and focused toward a particular end result." Penrod v. Commissioner, 88 T.C. 1415, 1428 (1987).  The most far-reaching version of the step-transaction doctrine, the end-result test, applies if it appears that a series of formally separate steps are really prearranged parts of a single transaction that are intended from the outset to reach the ultimate result.  See Penrod v. Commissioner, 88 T.C. at 1429, 1430 (citing Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179 (1942); South Bay Corp. v. Commissioner, 345 F.2d 698 (2d Cir. 1965); Morgan Manufacturing Co. v. Commissioner, 124 F.2d 602 (4th Cir. 1941);

---

[1](...continued)
1255 (7th Cir. 1988), the magic marker the Guligs used to paint the mustache on the Mona Lisa was filled with disappearing ink. However, the discussion in the text is presented as an alternative to a factual sham analysis.

Heintz v. Commissioner, 25 T.C. 132 (1955); Ericsson Screw Machine Prods. Co., v. Commissioner, 14 T.C. 757 (1950); King Enters., Inc. v. United States, 189 Ct. Cl. 466, 475, 418 F.2d 511, 516 (1969)). The end-result test is flexible and grounds tax consequences on what actually happened, not on formalisms chosen by the participants. See Penrod v. Commissioner, supra.

The sole purpose of the transactions orchestrated by Mr. and Mrs. Gulig was to reduce Federal transfer taxes by depressing the value of Mr. Strangi's assets as they passed through his gross estate, to his children, via the partnership. The arrangement merely operated to convey the assets to the same individuals who would have received the assets in any event under Mr. Strangi's will. Nothing of substance was intended to change as a result of the transactions and, indeed, the transactions did nothing to affect Mr. Strangi's or his children's interests in the underlying assets except to evidence an effort to reduce Federal transfer taxes. The control exercised by Mr. Strangi and his children over the assets did not change at all as a result of the transactions. For instance, shortly after Mr. Strangi's death SFLP made substantial distributions to the children, the Merrill Lynch account was divided into 4 separate accounts to allow each child to control his or her proportionate share of SFLP assets, and distributions were made to the estate to enable it to pay death taxes and post a bond. Mr. Strangi's testamentary

objectives are further evidenced by his practical incompetency and failing health at formation and funding of SFLP and Stranco and the short time between the partnership transactions and Mr. Strangi's death.

The estate asserts that property with a stated value of $9,876,929, in the form of cash and securities, when funneled through the partnership, took on a reduced value of $6,560,730. It is inconceivable that Mr. Strangi would have accepted, if dealing at arm's length, a partnership interest purportedly worth only two-thirds of the value of the assets he transferred. This is especially the case given Mr. Strangi's age and health, because it would have been impossible for him ever to recoup this immediate loss.

It is also inconceivable that Mr. Strangi (or his representatives) would transfer the bulk of his liquid assets to a partnership, in exchange for a limited interest (plus a minority interest in the corporate general partner) that would terminate his control over the assets and their income streams, if the other partners had not been family members. See Estate of Trenchard v. Commissioner, T.C. Memo. 1995-121; there the Court found "incredible" the assertion of the executrix that the decedent's transfer of property to a family corporation in exchange for stock was in the ordinary course of business. It is clear that the sole purpose of SFLP was to depress the value of

Mr. Strangi's assets artificially for a brief time as the assets passed through his estate to his children.  See Estate of Murphy v. Commissioner, T.C. Memo. 1990-472, in which this Court denied decedent's estate a minority discount on a 49.65-percent stock interest because the prior inter vivos transfer of a 1.76-percent interest did "not appreciably affect decedent's beneficial interest except to reduce Federal transfer taxes."  Estate of Murphy v. Commissioner, supra, 60 T.C.M. (CCH) 645, 661, 1990 T.C.M. (RIA) par. 90,472, at 90-2261.

Thus, under the end-result test, the formally separate steps of the transaction (the creation and funding of the partnership within 2 months of Mr. Strangi's death, the substantial outright distributions to the estate and to the children, and the carving up of the Merrill Lynch account) that were employed to achieve Mr. Strangi's testamentary objectives should be collapsed and viewed as a single integrated transaction:  the transfer at Mr. Strangi's death of the underlying assets.

In many cases courts have collapsed multistep transactions or recast them to identify the parties (usually the donor or donee) or the property to be valued for transfer tax purposes. See, e.g., Estate of Bies v. Commissioner, T.C. Memo. 2000-338 (identifying transferors for purposes of gift tax annual exclusions); Estate of Cidulka v. Commissioner, T.C. Memo. 1996-

149 (donor's gift of minority stock interests to shareholders followed by a redemption of donor's remaining shares treated as single transfer of a controlling interest); Estate of Murphy v. Commissioner, supra (decedent's inter vivos transfer of a minority interest followed by a testamentary transfer of her remaining shares treated as an integrated plan to transfer control to decedent's children); Griffin v. United States, 42 F. Supp. 2d 700 (W.D. Tex. 1998) (transfer of 45 percent of donor's stock to donor's spouse followed by a transfer by spouse and donor of all their stock to a trust for the benefit of their child treated as one gift by donor of the entire block).[2]

The reciprocal trust doctrine, another application of substance over form, has been used in the estate and gift tax area to determine who is the transferor of property for the purposes of inclusion in the gross estate. See United States v. Grace, 395 U.S. 316, 321 (1969) (applying the reciprocal trust doctrine in the estate tax context to identify the grantor, and quoting with approval Lehman v. Commissioner, 109 F.2d 99, 100 (2d Cir. 1940): "The law searches out the reality and is not concerned with the form."). More recently, Sather v. Commissioner, T.C. Memo. 1999-309, applied the reciprocal trust

---

[2]In Griffin v. United States, 42 F.Supp. 2d 700, 706 n.4 (W.D. Tex. 1998), the court distinguished Estate of Frank v. Commissioner, T.C. Memo. 1995-132, where this Court declined to integrate the steps of the transaction.

doctrine to cut down the number of present interest annual

exclusions for gift tax purposes:

>We must peel away the veil of cross-transfers to seek out the economic substance of the foregoing series of transfers. * * *

>              *      *      *      *      *      *      *

>We are led to the inescapable conclusion that the form in which the transfers were cast, i.e., gifts to the nieces and nephews, had no purpose aside from the tax benefits petitioners sought by way of inflating their exclusion amounts.  The substance and purpose of the series of transfers was for each married couple to give to their own children their Sathers stock.  After the transfers, each child was left in the same economic position as he or she would have been in had the parents given the stock directly to him or her.  Each niece and nephew received an identical amount of stock from his or her aunts and uncles and was left in the same economic position in relation to the others.  This was not a coincidence but rather was the result of a plan among the donors to give gifts to their own children in a form that would avoid taxes. * * * [Sather v. Commissioner, T.C. Memo. 1999-309, 78 T.C.M. (CCH) 456, 459-460, 1999 T.C.M. (RIA) par. 99,309, at 99-1964-99-1965.]

All this is set out most clearly in our reviewed opinion in

Bischoff v. Commissioner, 69 T.C. 32 (1977), as explained by the

Court of Appeals for the Federal Circuit in Exchange Bank & Trust

Co. v. United States, 694 F.2d 1261, 1269 (Fed. Cir. 1982):

"We agree with the majority in Bischoff and the appellee in this

action [the United States] that the reciprocal trust doctrine

merely identifies the true transferor, but the actual basis for

taxation is founded upon specific statutory authority."

In <u>Estate of Montgomery v. Commissioner</u>, 56 T.C. 489 (1971), affd. 458 F.2d 616 (5th Cir. 1972), an elderly decedent, who was otherwise uninsurable, purchased a single premium annuity and was thereby able to obtain life insurance that he assigned to trusts. The Court held that the arrangement was not life insurance within the meaning of the parenthetical exception contained in section 2039, and therefore, the proceeds of the policies were includable in decedent's gross estate.  In so holding, the Court used the language of step transactions to find that the annuity and insurance were part of a single investment agreement.

<u>Daniels v. Commissioner</u>, T.C. Memo. 1994-591, applied the step-transaction doctrine in a gift tax case in favor of the taxpayers to conclude that an outright gift of common stock to children and a simultaneous exchange of some common for preferred were parts of the same gift.  As a result, the Commissioner's belated attempt to tax the imbalance in values on the common-preferred exchange was barred by the statute of limitations.

My conclusion that the property to be valued for estate tax purposes should be the property transferred to SFLP is further supported by the decision of <u>Citizens Bank & Trust Co. v. Commissioner</u>, 839 F.2d 1249 (7th Cir. 1988), affg. <u>Northern Trust Co. v. Commissioner</u>, 87 T.C. 349 (1986).  There, the Court of Appeals for the Seventh Circuit held that the taxable value of a gift is not altered by the terms of the conveyance; therefore,

"restrictions imposed in the instrument of transfer are to be ignored for purposes of making estate or gift tax valuations". Id. at 1252-1253.  I conclude that the formation of SFLP and subsequent distributions of partnership assets should be treated as parts of a single, integrated transaction, and that the SFLP agreement is properly viewed as a restriction included in the testamentary conveyance to the Strangi children.  Accordingly, under Citizens Bank & Trust Co. v. Commissioner, supra, and the other authorities previously discussed, any reduction in values allegedly caused by the SFLP agreement should be disregarded; under sections 2031 and 2033, the contributed property is the property to be included and valued in the gross estate.

PARR, J., agrees with this dissenting opinion.